IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

```
GOODRX, INC.,                    )
            Plaintiff,           )      April 30, 2024
                                 )
        -versus-                 )      9:24-MC-126
                                 )
                                 )      Charleston, SC
FAMULUS HEALTH LLC,              )
            Defendant.           )
```

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE BRUCE HOWE HENDRICKS
UNITED STATES DISTRICT JUDGE, presiding

A P P E A R A N C E S:

For the Plaintiff:     ANTHONY W. LIVOTI, ESQ.
                       J. THOMAS McBRATNEY, III, ESQ.
                       Murphy and Grantland
                       PO Box 6648
                       Columbia, SC 29206

                       DAVID J. LENDER, ESQ.
                       JENNIFER M. B. CROZIER, ESQ.
                       Weil Gotshal & Manges LLP
                       767 Fifth Avenue
                       New York, NY 10153

For the Defendant:     JULIANNE FARNSWORTH, ESQ.
                       LAUREN N. VRIESINGA, ESQ.
                       Moore and Van Allen
                       78 Wentworth Street
                       Charleston, SC 29401

For the Intervenor:    STEPHANIE G. FLYNN, ESQ.
                       Fox Rothschild LLP
                       2 W. Washington Street, Suite 1100
                       Greenville, SC 29601

                       ELLIE J. BARRAGRY, ESQ.
                       Fox Rothschild LLP
                       33 South Sixth Street, Suite 3600
                       Minneapolis, MN 55402

Karen E. Martin, RMR, CRR
US District Court
District of South Carolina

Court Reporter:          KAREN E. MARTIN, RMR, CRR
                         PO Box 835
                         Charleston, SC 29402

     Proceedings reported by stenographic court reporter.
     Transcript produced with computer-aided transcription
                         software.

3

```
 1                    Tuesday, April 30, 2024
 2        (WHEREUPON, court was called to order at 11:04 AM.)
 3            THE COURT:  Thank you.  Good morning.  Take your
 4    seats, please.
 5            All right.  Good morning.
 6            ATTORNEYS IN UNISON:  Good morning, Your Honor.
 7            THE COURT:  Before we get started, let's just
 8    start from left to right and everybody introduce
 9    themselves for the record and for the court reporter.
10            So I'm looking right at you, yeah?
11            MR. SZWAJKOS:  I'm Michael Szwajkos.
12            THE COURT:  Okay.
13            MS. FARNSWORTH:  He is the client, Your Honor,
14    not an attorney.
15            THE COURT:  He looked like a lawyer for a
16    second.  Sorry about that.
17            MS. VRIESINGA:  Good morning, Your Honor.
18    Lauren Vriesinga for Famulus Health LLC.
19            THE COURT:  Thank you.
20            MS. FARNSWORTH:  Juliannne Farnsworth for
21    Famulus Health.
22            THE COURT:  Good morning.
23            MS. CROZIER:  Good morning, Your Honor.
24    Jennifer Crozier on behalf of petitioner, GoodRx, Inc.
25            THE COURT:  Okay.  Thank you.
```

4

```
 1          MR. LENDER:  David Lender from the law firm Weil
 2   Gotshal for the claimant GoodRx.
 3          THE COURT:  Okay.
 4          MR. LIVOTI:  Good morning, Your Honor.  Anthony
 5   Livoti from Murphy and Grantland.  And I have my partner,
 6   Thomas McBratney here with me.  And we are local counsel
 7   for Mr. Lender and Ms. Crozier.
 8          THE COURT:  Okay.  Great.
 9          And now back row, left side -- well, your right
10   side.
11          MR. FLYNN:  Good morning, Your Honor.  Stephanie
12   Flynn.  I'm with Fox Rothschild on behalf of -- local
13   counsel on behalf of the intervenor, Prime Therapeutics.
14          THE COURT:  All right.  Thank.
15          MS. BARRAGRY:  Good morning, Your Honor.  Ellie
16   Barragry with Fox Rothschild on behalf of the proposed
17   intervenor, Prime Therapeutics, LLC.  I'm also joined by
18   the senior general counsel of Prime Therapeutics, Anna
19   Petosky.
20          THE COURT:  Thank you.  Welcome everybody to
21   Charleston.  We're here this morning for the motions that
22   have been filed in Case No. 24-CV-886, Famulus Health LLC
23   vs. GoodRx, Inc.  And I've consolidated the instant matter
24   with Case No. 24-MC-126.  And so we've got these pending
25   motions to be heard.
```

1          And just to give you kind of an overview, 10,000

2     feet, I'd like to hear first from Famulus on its petition

3     to vacate the arbitration award.  And then I'll hear from

4     GoodRx, who filed the response in opposition, and then

5     also a petition to confirm the award in the 24-126 matter.

6     And then I'm going to hear from Prime Therapeutics on its

7     motion to intervene in this matter.  And then from GoodRx,

8     because I understand it opposes Prime's motion.  And then

9     lastly, I'll hear from Famulus and then GoodRx about the

10    pending motions to seal various documents from the

11    underlying arbitration matter that have been attached to

12    the petition to vacate.

13         So I'm assuming that sounds good with everyone.

14    Otherwise they'd be jumping up and down.  And otherwise

15    I'm not going to ask if there's anything else we need to

16    take up unless there's something really critical.  Anybody

17    got anything?

18         **MS. FARNSWORTH:**  Your Honor, I just want to put

19    on the record that we had asked for a status conference so

20    we could obtain a scheduling order.  But in light of what

21    you just said, we're going to hear everything today here?

22         **THE COURT:**  Yes.

23         **MS. FARNSWORTH:**  Okay.

24         **THE COURT:**  So let's hear first from Famulus on

25    its petition to vacate the arbitration award.

6

1          **MS. FARNSWORTH:**  Your Honor, just to put this in

2    context, I know we've presented our petition to vacate and

3    amended petition but I just want to give you a brief

4    background about the case.  My client, Mike Szwajkos, is

5    the founder and President of Famulus LLC.  Famulus LLC is

6    a company that works in the pharmaceutical industry.  It's

7    very complicated.  We spent the last year going over the

8    different facts, but I'm just going to give you the brief

9    version.

10          His company operates as an in between for people

11    like Prime or people like GoodRx to try to help them get

12    from the client, who has the prescription, to the

13    pharmacy.  And the goal is to try to maximize the best

14    price you can get.

15          So in this case, Your Honor, in 2020, my client

16    founded Famulus LLC.  He's the sole founder and owner.

17    There are some other LLC participants.  After that, in

18    July of that year, GoodRx, who is a national company,

19    wanted to get involved in some more areas with integrated

20    cash because they had not done it before.  And when I say

21    integrated cash, that's just a method of what you do to

22    try to put the prescription and the people together.  So

23    it gets more complicated than that, but just so you'll

24    know there's integrated cash.  There's discount card,

25    which is what GoodRx had been doing in the past.

1          So they decided because of my client's expertise

2    in the area, for 25 years he had worked for numerous

3    companies and had been involved in that area alone, they

4    wanted to have his company, Famulus, help them as a

5    distributor to try to bring more people into the GoodRx

6    family.  And by doing that, GoodRx would make money.

7    Famulus would make money.  But he would be the person out

8    in the field to trying to get people to sign on to GoodRx.

9    And it was entering into this agreement that you have a

10   copy of in good faith, it was believed by Famulus that

11   GoodRx had his company's best interests, he had their

12   company's best interests.

13          It was apparent after several months that that

14   was not the case.  And Famulus had tried to bring, as part

15   of the distributorship agreement, a deal with Prime

16   therapeutics to GoodRx.  And this deal would have meant a

17   lot of money for Prime -- I mean, a lot of money for

18   GoodRx and some money for Famulus.  And it was going to be

19   a good deal for all three concerned.

20          And GoodRx told Famulus all the time they were

21   in good faith considering the idea, considering the offer.

22   Then one day just out of the blue, they said, I'm sorry,

23   we're not going to go forward with the Prime deal.  But by

24   the way, you can't go forward with any working with Prime

25   either because of our agreement.

1          My client, Famulus, terminated the agreement for

2    cause.  And then later proceeded to enter into an

3    arrangement with Prime that had nothing to do whatsoever

4    with GoodRx or any of the information that they allege

5    that my client had obtained from GoodRx.

6          In February of 2023, GoodRx filed a demand for

7    arbitration.  That demand for arbitration only asked for

8    two things.  It was a breach of contract claim.  It said

9    that Famulus had violated the confidentiality provision of

10   the agreement.  And it said that Famulus had violated the

11   exclusivity part of the agreement.

12         During the course of February through June, we

13   were trying to select an arbitrator.  We submitted

14   discovery.  There was discovery delays.  There were

15   thousands and thousands of documents.  We finally had an

16   arbitrator selected.  But, Your Honor, as you'll find, and

17   I may not get into all of it right now, but all the

18   exhibits that we have submitted to you will show that

19   during the course of that time, the arbitrator from the

20   beginning was not fair.  And all the actions that she took

21   were prejudicial to my client and to the case.

22         So the most important thing I want to tell you

23   about is pre-hearing malfeasance.  In the statute, statute

24   9 of the Federal Arbitration Act, they have a provision

25   that has four grounds of what you can ask for a court to

1    vacate.  We know it's a high standard.  GoodRx submits to

2    the Court that the only standard is if the arbitration is

3    held, then that's all you have to do.  But, Your Honor, we

4    argue in advance that's nonsensical.  Because if that was

5    the case, the Federal Arbitration Act would not have

6    provided provisions where you could get an award vacated,

7    or modified, or set aside.

8         And Your Honor, in this particular provision of

9    the Federal Arbitration Act, one of the grounds

10   specifically says, Part 3, Where the arbitrators were

11   guilty of misconduct in refusing to postpone the hearing

12   upon sufficient cause shown, or in refusing to hear

13   evidence pertinent and material to the controversy, or any

14   other misbehavior which the rights of any party have been

15   prejudiced.

16        So, Your Honor, most importantly, first thing,

17   other things happened.  But the most important first thing

18   that the arbitrator did wrong, both parties, GoodRx and

19   Famulus, submitted a consent request, joint consent

20   request to the arbitrator saying we were not -- we're not

21   going to be ready for a hearing on November 27th.  We have

22   good reasons and we submitted the good reasons.  Discovery

23   wasn't complete.  We had depositions to take.  Numerous

24   other sufficient cause shown.  And without even -- two

25   hours after we asked it by email, the arbitrator says, No.

1   I have it on my calendar.  I told you when we set the date
2   that I was not changing it for any reason.  Denied.  Your
3   Honor, Famulus even asked for her to reconsider her
4   decision.  And she said no.  So that was the first
5   wrongdoing that she did.
6        And so as a result, we're scurrying around.  We
7   even said, We have an available date in April of 2024.  We
8   looked at her calendar.  We said, We don't want to be any
9   inconvenience to you but we're just not ready for a
10  hearing at this time.  She said no.
11       We proceeded.  We took numerous depositions.  We
12  exchanged numerous documents.  We still were not ready for
13  the hearing.  There was still outstanding discovery,
14  outstanding subpoenas that had not been issued.  I mean,
15  and part of reason we wanted to fully brief this more is
16  to give you examples of all the things that we needed to
17  do.
18       Famulus goes back to her before two weeks before
19  the hearing and says, Your Honor, A-B-C-D-E-F through Z,
20  we are not ready for a hearing.  We respectfully ask for a
21  continuance.  Prime had submitted a letter saying they
22  would like to submit someone on the issue of the
23  injunction and whether or not the injunction should issue.
24  Again, without any reason, she just in an email said, No.
25  No.

1         And Your Honor, the reason this is so

2    prejudicial and the reason it's in the statute is because

3    if you're not prepared for a hearing and the statute --

4    and the AAA rules say that you can ask for a request at

5    any time, and this says that if sufficient cause is shown,

6    then the arbitrator should, shall continue it.

7         Your Honor, the weekend before the hearing we

8    were traveling to Hilton Head.  And the arbitrator is

9    still issuing rulings excluding lay witnesses, excluding

10   expert witnesses, excluding rebuttal witnesses, telling

11   Prime that they can't bring Marci Conlin to come testify.

12   So, I mean, there's just so much more I could tell you

13   about it.  But just for you to know now, there is ample

14   evidence to vacate this award just on that fact alone.

15   But we have other facts.

16        So in a nutshell, in summary, the arbitrator on

17   two occasions refused to continue the hearing.  And as a

18   result, my client did not receive a fair and just award.

19        **THE COURT:**  Isn't it a may not a must in terms

20   of the arbitrator?  She's got discretion to postpone a

21   hearing upon a request?

22        **MS. FARNSWORTH:**  Well, it says -- what it says

23   here doesn't say may or must or shall.  It says, Where the

24   arbitrators were guilty of misconduct in refusing to

25   postpone the hearing upon sufficient cause shown.  And

1   that is the ground, if you look under Title 9, Section 10,
2   Subsection A3, In any of the following cases, the United
3   States may make or you may make an order.  But she didn't
4   have the discretion.  You have the discretion, may.  But I
5   don't believe the arbitrator has the discretion.  Because
6   it doesn't say in here if the arbitrator decided it wasn't
7   a good idea, or if it didn't fit her schedule, or if she
8   wanted to make sure she received her fee for the year,
9   then she's just not going to continue it regardless of
10  what's happening with the evidence in the case and
11  regardless of the fallout that's going to occur to the
12  parties.
13          And Your Honor, it's -- additionally, it's not
14  discretionary if it robs Famulus of a fair hearing and
15  that's what we allege happened in this case.
16          So this is -- and another thing that happened
17  that we think is very important, it was a manifest
18  disregard of the law.  There were other parties involved
19  besides GoodRx and Famulus.  We were the only two parties,
20  these are the only two people that were part of the
21  distributorship agreement.
22          But, for example, you've heard from Prime.
23  You're going to hear from Prime later.  They believe they
24  have a right to be involved in this case.  There are other
25  parties, Express Scrips is one of them.  And when I told

1    you earlier that GoodRx just out of the blue one day said,

2    oh, we're not going to do business with Prime,

3    Mr. Famulus.  So you're just going to have to go do your

4    own thing, you just can't do it with them either.

5            Well, there was another company called Express

6    Scrips.  And in the hierarchy of these pharm -- it's

7    called PBMs, pharmaceutical benefit managers.  So they

8    have tiers.  They have Tier One, which is Express Scrips,

9    Prime, other people.  And then you have different tiers.

10           So Express Scrips, who GoodRx is in contract

11   with right now, they're the ones that said you're not

12   going to do work with Prime because they're in our tier

13   and they're going to compete with us.

14           So, Your Honor, from the very beginning of

15   discovery, the very first request for production and

16   interrogatories we submitted to GoodRx, we said we'd like

17   every document you have about Express Scrips and WellDyne.

18   And we'd also like to take their deposition, that was

19   later.  And we'd also like for you to tell us what

20   involvement they had at all with the decision not to go

21   forward with the Prime deal.  Every time we received a

22   response, it said this is not relevant and/or either we're

23   still investigating all the time.

24           So, finally, after receiving two of those

25   responses, we submit to the judge that we would like a

1    non-party subpoena to Express Scrips and WellDyne.  This

2    is routine.  GoodRx had already gotten a non-party

3    subpoena for someone that they believed had some

4    information.  Within -- instantly, GoodRx objected for no

5    reason.  They were saying, GoodRx said it was not relevant

6    even though that's not for them to decide.  We briefed

7    this extensively with the Court.  We told her why it was

8    relevant, why we needed it.

9            And then she said, okay, I'll let you narrow

10    your subpoenas.  So we narrow the subpoenas.  And

11    immediately, GoodRx says no, they are still not relevant.

12    I mean, and we told the judge, Your Honor, why don't you

13    just do an in camera review?  Why don't you look at it and

14    decide instead of letting the other side say it's not

15    relevant?

16            Your Honor, this went on from June until

17    November going back and forth, going back and forth.

18    Finally, eight days before the hearing she said, okay,

19    narrow it one more time, I'll send it out.  We didn't even

20    hear from WellDyne before the hearing.  And we heard from

21    Express Scrips and, you know what they said?  We don't

22    recognize that subpoena.  We don't recognize the

23    arbitrator having authority to even issue a subpoena.

24            So then we asked her if we could take the

25    deposition.  If they weren't going to give us any

1    documents, because we knew how important it was to get the

2    information from Express Scrips because one of their

3    documents that they accidently submitted to us was a

4    PowerPoint that talked about how they were meeting with

5    Express Scrips, not only about Famulus, but about Prime.

6    And so it's like the smoking gun right there.

7           But anyway, so we never got any documents from

8    Express Scrips.  And we got a few documents from WellDyne

9    after the hearing.  So, Your Honor, just those two things

10   alone, by failing to continue the hearing, by failing to

11   allow Famulus to engage in meaningful discovery to

12   non-parties, just those two things alone prevented Famulus

13   from having a fair hearing.

14          All right, Your Honor, and during the hearing, I

15   think we've alluded to some in our briefs, but there were

16   also things during the hearing.  Let me just talk about

17   the witnesses.  I mentioned this earlier.

18          We -- GoodRx submitted their experts' reports.

19   We submitted our experts.  They objected.  The judge

20   struck our witnesses and said no rebuttal witnesses.  She

21   would not allow our experts unless we had -- unless we --

22   she would not allow them.  So that tied our hands at the

23   beginning of the arbitration hearing.  So we're not allow

24   to have the witnesses.

25          And all throughout the hearing, this is an

1  example of sour grapes, which is things that prevented

2  us -- like, for example, no dispositive motions. We had a

3  scheduling -- consent scheduling order of what was going

4  to happen when.

5       THE COURT: Let me circle back a second, please.

6  You're going like 90 miles an hour.

7       MS. FARNSWORTH: I'll slow down.

8       THE COURT: That's okay. I represent the court

9  reporter here.

10       THE COURT REPORTER: Thank you.

11       THE COURT: I've got to live with her. So I'm

12  going to circle back for a second. Why were those three

13  party documents material to the dispute that was before

14  the arbitrator?

15       MS. FARNSWORTH: You mean the non-party

16  documents? Your Honor, they were so material because we

17  had counterclaims. We had counterclaims against GoodRx.

18  One of them was for the breach of fair dealing and good

19  faith. One of them was for interference with contractual

20  relationships. We had four counterclaims, over and above

21  our defenses.

22       And we couldn't find out why -- we knew that

23  GoodRx had acted in bad faith. We knew -- we heard in the

24  industry rumors that it had something to do with Express

25  Scripts. They were telling us -- we did a search and it

1    just never came up.

2          But then when they produced this document that

3    they called Project Echo.  It was a confidential, internal

4    GoodRx document that they submitted to their officers that

5    were working on this team.  And in it there's all these

6    different scenarios.  And it says what they wanted to do

7    was do business with Prime and get Famulus out of the

8    picture so they would receive all of the revenue versus

9    his portion.  So this was a 40-page document.  And it says

10   all these different little pictures and words that said,

11   A, we'll work with Famulus; b, we'll get Famulus out but

12   we'll work with -- but all along it was working -- it was

13   the deal with ESI, Express Scrips.

14          If we had seen those documents when we started

15   defending the arbitration, it would have made all the

16   difference.  If we could have taken a deposition of

17   someone from Express Scrips and asked them point blank,

18   did you or did you not tell GoodRx that they could not do

19   business with Famulus if Famulus was going to do business

20   with Prime?  If we had found that out, that would have

21   made all the difference.  And it would have probably

22   allowed us to have a dispositive motion for -- on some of

23   the defenses and claims that we had to defend against.

24          So, I mean, I can go on and on why it would have

25   made such a difference.  But we never received those

1    documents.  We never got to take their deposition.  And

2    then they just thumped the nose of the arbitrator.  I

3    mean, she finally, after months and months of wrangling,

4    said she would submit a narrowed, reduced version.

5         So that was the two main things pre-hearing.

6    During the hearing she didn't allow us to have the

7    witnesses we needed.  She excluded rebuttal witnesses for

8    the expert, Your Honor.

9         And then post-hearing, this is where it gets a

10   little more testy.  So in AAA, it says that we're going to

11   close the hearing and then that's going to be it.  You

12   can't have any contact with the arbitrator.  So we already

13   had a scheduling order that we were going to have the

14   hearing from November 27th until December the 1st.  And

15   then there was going to be a time for us to submit

16   post-hearing briefs.  And then there was going to be a

17   time for the case to be closed and her to issue her order.

18        We submitted post-hearing briefs.  And at that

19   time, without any solicitation or request from the

20   arbitrator, GoodRx submitted a proposed order that we

21   objected to immediately.  In that proposed order were two

22   very important things.  It was a definition of Solutions;

23   Solutions being the area that Mr. Szwajkos and Famulus

24   could work in.  It also had parties that had talked about

25   it was going to be enjoining against not only Prime but

1    other parties.  And then it also talked about how broad it

2    was, like who you could and could not do business with.

3    And, Your Honor, if you take it at face value, even the

4    lawyers who worked on the case could not ever do work in

5    the industry.

6          But, Your Honor, the reason that's important,

7    not only did the arbitrator not ask for it, none of the

8    things that were in that proposed order were brought up at

9    the hearing.  There's no evidence in the transcript, four

10   and a half days, about any of that.  It was just something

11   that GoodRx slipped in there later among some other things

12   that happened before she issued her award on

13   February 16th.  The arbitrator just signed it.  She signed

14   it even though she, obviously, knew or didn't care that

15   none of the -- there was no evidence to support any of it.

16         And Your Honor, that's taking me to my next

17   thing.  So before we get to the actual injunction and the

18   award, so after that, after she -- we get a AAA email that

19   says, Case is closed.  Don't contact the arbitrator.

20   She'll rule eventually.  She sends out an email and she

21   said, I just want to ask about damages.  I want to ask

22   GoodRx, assuming that the breach did occur, please tell me

23   what your damages would be?  Now this is after the case is

24   closed, totally in violation of the AAA rules, totally in

25   violation of good faith from a judicial officer.  And then

1   she allows GoodRx eight to ten days to respond.  And then

2   she gives us two days to respond.  And Your Honor, the

3   basis of that post-closed hearing information request is

4   what she used for her injunction.

5           So then we get to the -- and this is an

6   abbreviated version, because we still had so much more we

7   wanted to brief and tell you about.  But when the award

8   came out, three different orders.  And they weren't put

9   together.  Like, the injunction was not an exhibit to the

10  award.  We just received a AAA email on a Friday afternoon

11  that said, Judge Ray has ruled and here are the three

12  orders.  One order was an injunction that didn't go --

13  didn't say it went to anything relating to the award.  One

14  was an award.  And one was an order for costs.

15          I'll talk about the order for costs just because

16  it's clearly prohibited.  In the agreement between GoodRx

17  and Famulus, there is a provision that talks about

18  arbitration.  It says it will be a single arbitrator.  It

19  will be held in the residence of Famulus.  And each party

20  will pay its own costs and fees.  That's black letter law

21  in the agreement.  Therefore, the order for costs is a

22  violation.

23          Secondly, Your Honor, the award is internally

24  inconsistent.  But what's most important, it's

25  inconsistent when you look at the injunction.  And the

1    injunction is the most important thing we want to talk

2    about now today.  And I think that's what Prime is here to

3    talk to you about.

4            Your Honor, first of all, the injunction is

5    based on a proposed order language that no evidence was

6    submitted at the hearing to support it.

7            Secondly, it is so inconsistent.  At one time it

8    says we're enjoining for breach of the confidentiality.

9    Then she's saying we're enjoining for the breach of the

10   exclusivity, which is totally in violation of what she put

11   in the award language.

12           And Your Honor, finally, the breadth and the

13   scope of the injunction, which we've briefed some but we

14   could add more, is impossible to enforce.  I mean, if you

15   take the injunction at face value, it says that

16   Mr. Szwajkos and anyone who has ever been associated with

17   Famulus is never going to be able to do business in that

18   space again.  Not only for integrated cash, which is what

19   GoodRx and Famulus contracted about, but discount cards.

20   If you read it, it's almost anything.

21           And then, Your Honor, it goes on to say that

22   we're going to require Famulus within five days of this

23   order, before it's confirmed, before it's argued before a

24   federal judge, we're going to say five days, Famulus has

25   to notify A-B-C-D-E-F companies that it can no longer do

1    business with them.  Immediately.  And when you do, you

2    have to let GoodRx know.  Well, Your Honor, that's why

3    Prime is here.  Prime is one of those A-B-C-D companies.

4    So this order that has nothing to do with any of these

5    other companies, whose names did not come up at all in the

6    discovery, the judge just -- she got it from the proposed

7    order.  She just signed the proposed order like it said.

8    It had nothing to do with anything.

9            So, Your Honor, if this award and injunction is

10   allowed to stand, first, it can't because it's just so

11   inconsistent.  It's unenforceable.  The scope is too

12   broad.  And we would -- and it has totally deprived my

13   client for public policy reasons, constitutional reasons,

14   and other reasons under the Federal Rules of Civil

15   Procedure of a fair trial and a just hearing.

16           **THE COURT:**  Okay.  Thank you.

17           Yes?

18           **MR. LENDER:**  I'll come up to the podium, if

19   that's okay.

20           **THE COURT:**  That's fine.

21           **MR. LENDER:**  Thank you.  Good morning.  Again,

22   David Lender for the petitioner, GoodRx.

23           After a weeklong hearing, in which the

24   arbitrator heard testimony from nine witnesses and

25   admitted dozens of exhibits into evidence, the arbitrator

1    found that Famulus breached its exclusivity and

2    confidentiality obligations owed to GoodRx under the

3    parties' agreement by developing and selling a competing

4    product based on GoodRx's confidential information.  And

5    to remedy those breaches, the arbitrator awarded damages

6    to cure the past and an injunction to prevent future

7    misuse of our confidential information going forward.

8            Now, as Your Honor knows, a motion to vacate an

9    arbitration award is not an opportunity for the loser of

10   the arbitration to relitigate the merits.  And I think a

11   great majority of what I just heard from Ms. Farnsworth is

12   literally re-litigating the merits.  As the Fourth Circuit

13   has made clear, convincing a federal court to vacate an

14   arbitration award is a herculean task.  The scope of

15   review of an arbitrator's decision is extremely narrow,

16   exceedingly deferential, and among the narrowest known at

17   law.  Because to allow full scrutiny of such awards would

18   frustrate the purpose of having arbitrations at all.  And

19   that comes from Warfield, the Fourth Circuit decision.

20           Further, when reviewing an arbitrator award, a

21   court is limited to determining whether the arbitrator did

22   the job they were told to do, not whether they did it well

23   or correctly or reasonably, but simply whether they did

24   that, whether they did it.  And again, that comes from the

25   Fourth Circuit decisions of Warfield, Three S Delaware,

24

1    and Your Honor's own decision in the Wells Fargo case.

2    Here, there can be no real question that the arbitrator, a

3    well respected former judge with more than 20 years on the

4    bench, did the job she was asked to do.

5            In its petition to vacate, Famulus comes nowhere

6    close to presenting the exceptional case for overturning

7    an arbitration award.  Instead, what Famulus did is they

8    identified essentially every possible ground for vacating,

9    and offered only general, unsupported grievances in its

10   petition to vacate; exactly what you saw in Wells Fargo.

11   Then they failed to file any reply brief to our opposition

12   to the motion to vacate.  And they failed to respond to

13   our motion to confer.  Thus, Famulus did not meet its

14   heavy burden to demonstrate that the arbitration award

15   should be vacated and, accordingly, it must be confirmed.

16           Now, I think recognizing this, they effectively

17   sought a do-over because they filed an amended petition

18   after the briefing on the motion was complete.  And

19   normally, once a motion is complete, you just don't get a

20   do-over.  But that's what they tried to do here.  Famulus

21   proceeded at its peril when it failed to raise its

22   arguments on the merits in its petition.  And the Court

23   could confirm the award on that basis alone.

24           However, if Your Honor's going to consider the

25   arguments that were made in the amended petition,

1    basically the do-over motion, it comes nowhere close to

2    meeting Famulus' heavy burden to vacate the arbitration

3    award.  Your Honor, I'd like to just briefly walk through

4    the different arguments so we can at least have our

5    response on the record.

6             The first issue they raise is manifest disregard

7    of the law.  Ms. Farnsworth didn't make that argument here

8    before you but it is in their papers.  The Fourth Circuit

9    has made clear though in Jones that the manifest standard

10   is not an invitation to review the merits of the

11   underlying arbitration or to establish that the arbitrator

12   misconstrued or misinterpreted the applicable law.

13   Rather, appellant is required to show that the arbitrator

14   was aware of the law, understood it correctly, found it

15   applicable to the case before them, and yet chose to

16   ignore it.  Or the way -- I think the way Judge Duffy

17   explained it in United States vs. Pete Brown And

18   Associates, 771 F.Supp.2d. 576 at 585, is a nice

19   articulation of the law.  What he said is, Even if a

20   federal court is convinced that the arbitrator made the

21   wrong call on the law, on the contrary, the award should

22   be enforced despite a Court's disagreement with it on the

23   merits if there's a barely colorable justification for the

24   outcome reached, barely colorable justification.

25             Here, we submit the arbitrator got the law

1    right.  But certainly, there was at least a colorable

2    justification for the outcome reached.  And nowhere,

3    nowhere does Famulus point to some binding precedent that

4    the arbitrator recognized but disregarded.  Instead, what

5    the arbitrator did here is what arbitrators and courts do

6    all the time.  They awarded damages for the past breaches

7    and an injunction to prevent future breaches.

8            It's also wrong for Famulus to suggest that

9    somehow the arbitrator did something wrong because they

10   didn't lay out in the opinion all the four factors for the

11   injunction.  Both parties provided extensive briefing on

12   the issue and spent significant time during the

13   arbitration on the issues pertaining to the injunction.

14           And the law is clear, and the Fourth Circuit has

15   been clear, and the Supreme Court has been clear that an

16   arbitrator has no obligation to the court to give their

17   reasons for the award.  United Steelworkers, Supreme

18   Court; Wachovia, Fourth Circuit.  In fact, as the Fourth

19   Circuit held in Warfield, 26 F.4th at 673 to 674, Of

20   course, arbitrators are not required to explain their

21   reasoning.  Instead, when arbitrators do not explain how

22   they reached a given result, the party seeking vacatur

23   must show that it would be manifest disregard of the law

24   to reach that outcome by each and every conceivable route.

25   Famulus comes nowhere close to meeting that heightened

1    standard here.

2        The next thing you heard is about these

3    procedural rulings that the arbitrator made that Famulus

4    claims deprived it of a fair hearing.  But as the Fourth

5    Circuit held in Wachovia, Arbitrators, quote, Have broad

6    discretion to set applicable procedure; and quote, An

7    arbitrator's procedural ruling may not be overturned

8    unless it was in bad faith or so gross as to amount to

9    affirmative misconduct.  That's 671 F.3d 472 at 479.

10   Here, each of the procedural rulings Famulus points to

11   were well within the arbitrator's discretion or really

12   the -- their own making.  It was the making of Famulus'

13   own behavior.

14       And I'm going go through the different

15   procedural issues that she addressed.  The first is this

16   issue about whether they were going to be allowed to call

17   five late-identified witnesses, two of whom they claim are

18   these hybrid, lay-expert witnesses.  Well, Famulus

19   provided no expert reports for those two hybrid witnesses.

20   And the arbitrator also found that Famulus had failed to

21   disclose the five witnesses during discovery.

22       Nonetheless, the arbitrator ultimately ruled

23   that Famulus could call any of those five witnesses as

24   long as they first put them up for a deposition.  And then

25   Famulus decided just to put two of them up for a

28

1    deposition.  We deposed them both.  And they both appeared

2    and testified extensively at the hearing.

3           The folks that she's now complaining about, this

4    second expert, Kuemar, and the Prime witnesses -- witness

5    were two witnesses that they chose not to put up for a

6    deposition.  They had them on the list.  And then they

7    pulled them down and didn't put them up for a deposition.

8    So the arbitrator said, well, yeah, you can't call them as

9    witnesses at the trial.  That was the deal.

10          So what they really are complaining about now

11   is, what ended up happening is after they identified the

12   two witnesses, we deposed them, they were allowed to

13   testify, the night before the hearing, they said, you know

14   what, we've changed our mind again.  We now want to call

15   the Prime witness that we pulled down earlier.  And the

16   court and the arbitrator said that's just not fair.  You

17   can't bring in a new witness the night before the

18   arbitration.

19          And that's exactly what the Fourth Circuit faced

20   in the East Fire case.  What the court found there is

21   that, in addition to violating the rules on witness

22   disclosure and the court's prior orders, the limitation,

23   quote, was necessary to prevent undue prejudice to GoodRx

24   that would have resulted from Famulus' failure to disclose

25   its proposed evidence.  Nonetheless, during the hearing,

1    Mr. Szwajkos was allowed to testify extensively about his

2    interactions and Famulus' interactions with Prime, which

3    the arbitrator actually noted during the hearing at

4    transcript at 12/20 to 12/22.

5        Okay.  Next one up is the third parties, ESI and

6    WellDyne, that they weren't allowed to call at the

7    hearing.  But again, Your Honor, that was the exact same

8    issue.  Famulus raised this issue on calling -- getting

9    these folks subpoenaed to appear at the hearing on the

10   Saturday before the hearing, so less than 24 hours before

11   the hearing as part of a last-ditch effort to seek a

12   continuance.  And that document is at the amended petition

13   Exhibit 44.  But again, the arbitrator there was well

14   within her discretion not to subpoena third parties to

15   appear at the arbitration less than 48 hours before the

16   hearing was about to begin.

17       Now, you also heard they're complaining about

18   the fact that the arbitrator considered a draft injunction

19   order provided by us and that she ordered supplemental

20   briefing on one issue.  But it's common practice to submit

21   draft orders as part of your submissions, this is the

22   injunction we were seeking, and for arbitrators to ask for

23   additional briefing based on the evidence presented.  It's

24   also permitted under the rules, Rule 41.  And Famulus had

25   the opportunity to respond to the additional briefing,

1    which it did, and to respond to the proposed injunction,

2    which it chose not to.  It literally provided no response.

3    Nothing.  That was their decision.

4            Okay.  So the next thing you heard is the -- oh,

5    the last thing is this issue about this inconsistency with

6    the award and the injunction.  There's one paragraph, the

7    first paragraph of the injunction, which is inconsistent

8    with the award.  And we've been clear.  We've been clear

9    the whole time.  We've been clear in papers.  And I'll be

10   clear here on the record.  We are not seeking to confirm

11   or enforce that first paragraph of the award.

12           Okay.  The next one is the misconduct in not

13   postponing the hearing.  First of all, Your Honor, it is

14   absolutely a may standard, as you noted.  We cited the El

15   Hadad case, 485 F.Supp.2d. at 677.  It's also in Rule 31,

16   it's a may standard.  The arbitrator here was clear, very

17   clear that the arbitration was a firm setting and would

18   not be postponed.  That's Exhibit 13 and Exhibit 21 to our

19   petition to confirm.  And it is well within the

20   arbitrator's broad discretion to set applicable

21   procedures, adhere to established schedules, and to

22   prevent unnecessary delays.

23           The only prejudice that Famulus identifies in

24   their briefing on the decision not to postpone are these

25   documents that they couldn't get from ESI and WellDyne.

1    But, Your Honor, it was their own lack of diligence that

2    resulted in the delay of the issuance of those subpoenas.

3    They served overbroad subpoenas.  We objected.  The

4    arbitrator agreed and they were ordered to narrow them.

5    And they were the ones that waited six weeks before

6    submitting the revised subpoenas.  That's on them.  That's

7    not on us.

8            And Your Honor, when Ms. Farnsworth said, well,

9    we never heard from WellDyne, you heard that today, well,

10   if you look at Exhibit 37 attached to our petition to

11   vacate, they represented that WellDyne had said they would

12   respond to the subpoena if the arbitrator just issued it,

13   which the arbitrator did.  And then WellDyne didn't

14   produce the documents.  So they represented that WellDyne

15   wouldn't respond.  WellDyne just chose not to.  And as you

16   heard, ESI did the same thing.

17           You had asked, Your Honor, how this stuff is

18   relevant?  It's actually, our position is it's really not.

19   The arbitrator asked and recognized repeatedly.  She

20   questioned the importance and relevance of these

21   materials.

22           One example is her August 7th, 2023,

23   correspondence, Exhibit 19.  And Your Honor, if you look

24   at the decision, the decision tells you that the ESI

25   information is not relevant.  Because what the judge, the

1   arbitrator ultimately concluded was that Famulus had

2   breached the agreement well before there ever was ESI on

3   the scene.  So what happened subsequently with ESI had

4   nothing to do with the breach that she was remedying

5   through her damages and her injunction award.

6        The last thing that Famulus complains about is

7   the arbitrator awarding certain costs and fees.

8        **THE COURT:**  What about Famulus' counterclaims?

9        **MR. LENDER:**  The counterclaims, yes, the four

10  counterclaims?  The four counterclaims, one was breach of

11  the implied covenant of good faith and fair dealing, one

12  was a disparagement claim, a defamation claim, and a --

13  like a negligent -- I think it was, like, a tortious

14  interference but a negligence counterclaim.

15       The reason why they claim they wanted the ESI

16  information is because they wanted to argue that we

17  subsequently entered into an agreement with ESI that had

18  exclusivity.  But the arbitrator recognized that the

19  subsequent agreement had exclusivity.  It was part of the

20  evidence that was presented to the court.  What the

21  arbitrator found was that had -- that the breach occurred

22  well before there ever was an ESI on the scene.

23       Or to say it a different way, what the

24  arbitrator found was that had Famulus not breached, we

25  would have entered into the agreement well before there

1    ever was an ESI.  So the subsequent ESI conduct and

2    information was completely irrelevant to the claims.  It

3    certainly had nothing to do with our breach claim.  And it

4    had nothing to do with their counterclaims based on the

5    evidence that was presented that, again, the exclusivity

6    was not -- the subsequent exclusivity agreement or ESI was

7    part of the evidence.  So there was no need for this

8    additional information.

9         As I said, ESI took the position that they were

10   never responding to that subpoena.  Right?  And under

11   arbitration rules, you actually can't compel a third-party

12   to produce documents in response to a subpoena.  That's

13   what they did.  ESI undisputedly said they were not going

14   to respond.  There was no jurisdiction over them.  So the

15   fact that the subpoena got issued, ESI was clear they

16   weren't going to produce the documents anyway.  And that's

17   Exhibit 50 to our petition to confirm.

18        Real briefly, Your Honor, the last thing is the

19   issue of costs.  The arbitrator imposed costs for those

20   two depositions that they were allowed to -- for the late

21   witnesses and as a sanction for failure to comply with

22   certain discovery orders.  No question, absolutely

23   permitted under Rule 24 and Rule 60 of the AAA rules.

24        The last thing which we just heard is that,

25   well, the agreement doesn't allow for the recovery of

1    costs.  The court concluded -- the arbitrator concluded

2    that under the agreement, as well as for sanctions, she

3    could award the costs of the arbitration not attorney

4    fees.  We were just talking about costs.

5                And part of the rationale for that, just so

6    we're clear, is Famulus asked for the costs of the

7    arbitration as part of their case.  So when the arbitrator

8    was interpreting the agreement, whether it was her

9    interpreting the agreement or as a sanction, the fact that

10   they asked for costs as well, it was completely within the

11   scope of her interpretation to decide that the agreement

12   allowed for it.

13               And, Your Honor, Oxford Health, Supreme Court,

14   this is incredibly how narrow we're talking the scope of

15   review is.  The question for a judge is not whether the

16   arbitrator construed the parties' contract correctly, but

17   whether she construed it at all.  That's the standard

18   based on the Supreme Court, 569 U.S. 564 at 573.

19               So, Your Honor, this is not an opportunity to

20   relitigate the case.  It's a very narrow review.  And

21   there is no basis for vacatur.  And based on the law, Your

22   Honor, if there's no basis for vacatur, the law says you

23   must confirm.  So we'd ask that you confirm the

24   arbitration award and allow us to proceed with enforcing

25   the award.  Thank you.

1           **THE COURT:** All right. Thanks.

2           All right. I'm ready to hear from Prime on its

3    motion to intervene.

4           **MS. FARNSWORTH:** Your Honor, can I not say

5    anything in response to that? Or are you going to do that

6    at a later time? I mean, I'd like to. At least the

7    record needs to show that I don't know if Mr. Lender, with

8    all due respect, was in the same courtroom as we were

9    today, but just a few things I want to point out.

10          One, I did talk about manifest disregard of the

11   law. Secondly, when they talk about that the arbitrator

12   only has to do the job that they were to do was to have

13   the arbitration. Well, Your Honor, we concede it's a high

14   standard, but it's not an impossible one. And what the

15   arbitrator's job to do in this case was to look at the

16   agreement between Famulus and GoodRx and decide whether or

17   not any of the terms had been breached. She didn't do the

18   job she was assigned to do. She went over and above that.

19          And Your Honor, I just can't let this stand any

20   longer, because they said this in their brief and it's

21   just not true. Express Scrips -- we went back and forth

22   for four months, and I'll be glad to supplement

23   information if the Court would -- I will show you how I

24   requested the subpoenas. They kept getting objected. I

25   revised them. They objected. We didn't wait six weeks to

1  send the subpoenas.  We waited until the judge said she

2  was going to issue them.

3         And I did say that we received words from

4  WellDyne.  And what I said this morning was that WellDyne

5  gave us their documents after the hearing.  I did not say

6  we never heard from WellDyne.

7         So, Your Honor, there's lots of

8  misrepresentations.  There's lots of information that you

9  need to know, but the most important is this.  GoodRx has

10  already asked for modification.  They concede, they

11  conceded in here this morning that the award on its face

12  has defects.  So they're asking you for a modification.

13  We're asking you to review it for a vacatur or

14  modification.  So it seems like just the fact that they're

15  asking you for it and we are that it needs to be done.

16         Thank you, Your Honor.

17         **THE COURT:**  Thank you.

18         All right.  So I'll hear from Prime.

19         **MS. BARRAGRY:**  Good morning, Your Honor.  Again,

20  Ellie Barragry with Fox Rothschild on behalf of the

21  proposed intervenor, Prime Therapeutics.  Thank you for

22  the opportunity to speak our motion to intervene in this

23  action.  I would like to provide a brief background

24  regarding Prime, the MedsYourWay Program, and how we got

25  here today, and then jump into the elements of

1   intervention.

2         One threshold issue that came to light through

3   the briefing is the issue of subject matter jurisdiction.

4   I think every party in this room would prefer to be in

5   this room and in this court.  But the FAA does not confer

6   jurisdiction over this dispute.  There must be independent

7   jurisdiction.

8         The parties have asserted diversity.  But

9   neither GoodRx nor Famulus has sufficiently pled the

10  citizenship of all the parties and that diversity actually

11  exists.  As a matter of crossing our Ts and dotting our

12  Is, I do think that's an issue that needs to be

13  established and confirmed before there's any ruling on the

14  merits.

15        So Prime is a pharmacy benefit manager, which

16  means it's a third-party administrator for prescription

17  drug programs for its paired clients, primarily for

18  not-for-profit Blue Cross Blue Shield health plans, as

19  well as self-funded employer plans, and union group plans,

20  and third-party administrators.

21        So what does that mean?  So as an individual,

22  you have your health plan, you have your health insurance.

23  And within that health insurance, you'll have your

24  prescription benefits.  Prime, on behalf of its clients,

25  administers those prescription benefits.  So Prime

1    contracts with pharmacies to build out the networks that

2    are the pharmacy networks.  Prime works with physicians to

3    create the drug lists that are covered under your health

4    plan.  And Prime negotiates with drug manufacturers to

5    reduce drug costs for Prime members.

6            Now, while these are typically the functions of

7    those associated with PBMs, PBMs have many functions.

8    Relevant to this dispute, it's also important to

9    understand drug discount cards or drug discount card

10   programs.

11           So we'll take GoodRx, for example, which we've

12   heard some things about today.  And I'm not going to go

13   into the weeds of how it works, but at a high level,

14   essentially GoodRx negotiates to get access -- negotiates

15   with certain healthcare entities in the market to get

16   access to discounted rates on pharmaceutical drugs.

17           So, for example, my middle child was diagnosed

18   with strep throat last week.  So I am going to go into the

19   pharmacy with my health insurance card.  And I'm going to

20   get from the pharmacy told what my insured price is for

21   that amoxicillin.  And say it's $10.  And that is the

22   insured price that's going to be my copay.  That's going

23   to go to my deductible.  That's going to go to my overall

24   healthcare costs, my maximum out of pocket.

25           Drug discount cards, like what GoodRx offers, is

1    they have negotiated and found access to discounted price,

2    these unfunded options. So I can look on GoodRx's website

3    and see they actually have access. And I could pay $3 for

4    that same amoxicillin.

5            Now, what that means, though, is if I go through

6    GoodRx independently, I'm not going through my insurance.

7    So my insurance doesn't know I got that prescription. My

8    insurance doesn't know I paid $3. It's not going to go to

9    my deductible. And it's not going to go to my maximum out

10   of pocket. I get that benefit of a lesser price, but it

11   doesn't reduce my overall healthcare costs and its offset

12   because there's this lack of integration. That's what

13   we're hearing about today, this integration between the

14   drug discount card programs and then the process at point

15   of sale.

16           And GoodRx is one drug discount card player in

17   the market. There are numerous other drug discount

18   networks available. Now, a fair amount of people don't

19   know about drug discount card programs. So you have to

20   know about those programs, and you also have to have

21   access to it. And every time you go in, you'd have to

22   compare your funded price with the unfunded price and then

23   decide which way you're going to go. And then it's not

24   going to go towards, like I said, your deductible, you

25   maximum out of pocket.

1          So back in 2020, what Prime wanted to do was

2     incorporate these drug discount card programs into the

3     point-of-sale process.  And it started with its mail

4     order, its home delivery.  So it worked with Amazon

5     Pharmacy to incorporate these drug discount card programs

6     into the actual purchasing process online.

7          Jump forward a year later in 2021.  Prime wanted

8     to incorporate the drug discount cards into the pharmacy

9     patient's member at the retail counter.  So that's when

10    Prime was introduced to Famulus, in July of 2021, as a

11    company that was aggregating drug discount cards, and as a

12    company that could help Prime build out its vision of

13    integrating these drug discount cards into a benefit for

14    its members.  That vision is what we now call MedsYourWay.

15         So what is MedsYourWay?  So how does that change

16    your member experience?  So in my amoxicillin example, as

17    opposed to me going in and getting the price of $10, I'll

18    go in and I will provide my insurance information.  At the

19    point of sale instantaneous my price is being compared

20    against all these unfunded options as well.  And based on

21    Prime created rules, then what comes back at the pharmacy

22    counter is here's the lowest price available.  It might

23    not be your insured price.  It might not actually be paid

24    by your insurer.  But you can pay it and you could buy it

25    for $3.

1          But the benefit here is Prime was a part of that

2     process.  It now knows you paid $3.  It knows you got that

3     prescription.  And it can use that, it can go towards your

4     deductible.  It can go towards your maximum out of pocket.

5     It provides that information for better drug management.

6          There are things called safety edits where

7     Prime, when it has access to all of your prescriptions,

8     that's a safety edit where it will have a notification if

9     you're taking drugs that have adverse reactions or you

10    shouldn't be taking at the same time.  Now, you have your

11    doctor that's also doing that, but it's another safety

12    edit that your pharmacy benefit manager does through your

13    benefits.  It's trying to track those safety edits.

14         So MedsYourWay launched in August of 2022.  So

15    as I said, we were introduced to Famulus in 2021.  So it

16    took about over a year from execution of the agreement to

17    actually launching of the program.  It took a lot of time,

18    effort, and resources to launch the MedsYourWay program.

19    There are currently over 6 million patients with access to

20    MedsYourWay.  And from December 2023 through

21    February 2024, MedsYourWay allowed patients to save

22    approximately $16 per prescription, translating to over

23    $50 million in member savings and over $12 million in plan

24    savings.  Now, Famulus is the switch vendor that Prime

25    uses to allow MedsYourWay benefit to function.

1          Moving forward to this dispute.  So Prime was

2    made aware of the existence of the arbitration in

3    September 2023.  As part of the arbitration, a dispute

4    arose over the production of Prime's agreement.  And Prime

5    has certain rights in its agreement with Famulus to

6    protect that information and make sure it's not disclosed.

7    Through the negotiation of the parties, we were able to

8    put added protections on and make sure that disclosure was

9    limited.  And we came to a resolution so that the

10   agreement was produced in the arbitration.

11         It's through that process that we learned for

12   the first time that Famulus was seeking to shut down

13   Famulus and prevent it from supporting the MedsYourWay

14   program.  Because of the threat to the very existence of

15   MedsYourWay, Prime submitted a letter to the arbitrator

16   expressing its concern that the harm to Prime, its

17   patients and its members, was not being considered in this

18   confidential arbitration.  All counsel of record was

19   included on that letter.  And we were pleading with the

20   arbitrator, Let us be heard on that issue.  We didn't have

21   access into what was happening in this confidential

22   arbitration.  We weren't there to take sides.  Our side

23   was on behalf of the patients and members and the clients

24   that we serve.

25         Now, in response to that letter, we were told

1    that the arbitrator indicated she was not going to

2    consider anything that Prime said unless Prime's testimony

3    was under oath at the hearing in accordance with

4    evidentiary rules, which we understood.  We started

5    preparing a witness.  And we contacted the arbitrator and

6    we said, We will make our VP of Networks available at the

7    hearing.  And we would make her available at that hearing.

8         Now, in response to our letter, even with the

9    understanding that she had asked that Prime have testimony

10   under oath at the hearing, we got a fairly abrupt

11   response, in particular to my partner, Bret Puls, asking

12   to stop contacting the arbitrator, and we were not parties

13   to the arbitration and to stop contacting her.

14        At that point in time, I mean, we stood by ready

15   and willing to participate at the arbitration, to present

16   a witness on the very real concerns of pharmacy patients

17   and clients.  But we were not allowed to present any

18   testimony at the arbitration hearing.

19        As Your Honor is well aware, then fast forward

20   on February 16th of this year, the arbitrator issued an

21   injunction award that is incredibly broad and far reaching

22   and that enjoins Famulus and anyone associated with

23   Famulus from supporting MedsYourWay, effective essentially

24   immediately, within five days.  Thereafter, Famulus filed

25   their petition to vacate.  And GoodRx filed its petition

1    to affirm the award.

2         Now, Prime has been in contact with Famulus and

3    GoodRx after learning of the award.  We've been trying to

4    obtain assurances that we can have continuity of

5    MedsYourWay.  That there can be some orderly

6    administration of this.  Now, we do take issue with the

7    issuance of the injunction at all.  But if it is going to

8    issue, it should have been done in an orderly fashion.  It

9    should have been taking into account the harm that is

10   going to instill on these members if they don't have

11   access to MedsYourWay.

12        We have not been able to reach a resolution

13   amongst the parties.  So giving the pressing timelines in

14   this case, we believe intervention is necessary to protect

15   Prime's significant interest.  So Prime has filed its

16   motion to intervene in this action as a matter of right,

17   or alternatively, seeks permissive intervention.  And as a

18   third alternative, Prime seeks the opportunity to submit

19   its evidence and arguments as amicus.

20        Now before I proceed to the elements of

21   intervention, I would notice a threshold matter as noted

22   in our brief.  Famulus has consented to Prime's

23   intervention in this action so I'll focus on GoodRx's

24   challenges to our intervention.

25        So Federal Rule of Civil Procedure 24(a)(2)

1    allows intervention as a matter of right when four factors

2    are met.  First, the application is timely.  Second, the

3    applicant, Prime, has an interest in the subject matter of

4    the underlying action.  Third, the denial of the motion to

5    intervene would practically impair or impede the

6    applicant's ability to protect its interests.  And fourth,

7    the applicant's interests is not adequately being

8    represented.

9         **THE COURT:**  Why can't Famulus adequately

10   represent?

11        **MS. BARRAGRY:**  So, Your Honor, there are a few

12   reasons that we are concerned with adequate

13   representation.  So what the courts look at in that

14   context is whether the interests are the same.  We have

15   similar interests but they are not identical.  The

16   standard for whether the interests are being represented

17   as described by the Supreme Court, it's a minimal burden

18   to show that your interests are not represented.

19        Now, Famulus has a very strong interest, as we

20   can hear from Ms. Farnsworth, to vacate the award.  We're

21   focused on the injunction and the fact that, one, our

22   interests were not heard as to whether an injunction

23   should have been issued at all and the potential harm on

24   innocent third parties.  But two, if you are going to

25   enter an injunction, what does that look like?  What is

1    the process to make sure that any harm to third parties is

2    minimal?  That's a separate interest from Famulus.  If

3    there's an injunction, I haven't seen Famulus put forward

4    any concern or interests into how an injunction would look

5    if it is going to be affirmed.  We have separate

6    interests.  It's a very minimal burden to show that our

7    interests are not being adequately represented.

8         And another point on the adequacy of

9    representation.  You know, part of this, again, it was a

10   confidential arbitration.  It is a little bit like peeling

11   back an onion.  With every brief, we're seeing a little

12   bit more about the arbitration.

13        I've seen some testimony cited about there being

14   fail safes.  It's our understanding that Famulus' founder

15   testified that there are fail safes in place if an

16   injunction is entered.  I can tell you that when Prime saw

17   that in the brief, we don't know what fail safes are being

18   referred to.  There are no fail safes to make sure that

19   MedsYourWay functions if an injunction is entered.  And

20   it's that sort of interests that can't be fully

21   represented if they don't have all the information.

22        So back to the timeliness of our motion.  So

23   GoodRx does not challenge the timeliness of this motion.

24   As I've said, we've been in contact with the parties.

25   GoodRx told us so long as we filed this motion before

1    April 11th, it wasn't going to challenge the timeliness.

2    We filed our motion by April 2nd.

3            Agreement amongst the parties aside, I think

4    this case just started.  It was filed -- we filed within

5    six weeks after the motion to vacate was filed.  I saw

6    that Famulus requested a briefing schedule on its recent

7    application that was filed on Friday.  And in addition to

8    the assurances that GoodRx did not believe that our motion

9    was timely, we think we've satisfied that this application

10   was timely.

11           Now, the next element of mandatory intervention

12   is whether Prime has an interest in the subject matter of

13   the underlying action.  The Supreme Court has said that

14   the intervening party must have a significantly

15   protectable interest.  Specifically, cases in the Fourth

16   Circuit say that a proposed intervenor has a significantly

17   protectable interest when a party, quote, stands to gain

18   or lose by the direct legal operation of the district

19   court's judgment.  There is no dispute that confirmation

20   of the injunction would shut down Prime's MedsYourWay

21   product.  Let there be no mistake, it will shut down.

22           So what does shutting down MedsYourWay mean?

23   That means disruption to pharmacy patient access to

24   affordable medications.  Patient access to affordable

25   medications impacts medication adherence.  As noted in our

1    reply, GoodRx itself has published a number of studies

2    emphasizing that exact point.  Shutting down MedsYourWay

3    impacts drug management.  It can interfere with Prime's

4    ability to perform those safety edits that I was referring

5    to before.

6         And then we have the irreparable financial harm

7    to clients, members, and Prime.  It's unrecoverable.

8    GoodRx emphasizes that Prime doesn't guarantee pricing to

9    members.  So what could really be lost?  That's almost

10   making the point.  That's precisely the point.  We don't

11   guarantee prices.  So if you shut down MedsYourWay, all

12   those savings, all of those savings by the members, by the

13   plans, that's all lost savings that are not recoverable.

14        Now, GoodRx attempts to minimize the potential

15   harm to Prime and focuses on trying to distance the issues

16   that can arise if medication costs get higher.  But the

17   issue is there's no legitimate dispute that Prime's

18   interest is not contingent, it's not remote.  MedsYourWay

19   will shut down under this injunction award.

20        Now, the practical impairment requirement.  The

21   courts look at whether denial would practically impair or

22   impede the ability to protect its interests.  Prime has an

23   interest in the continued operation of MedsYourWay.  Now,

24   GoodRx argues that Prime can bring a lawsuit against

25   Famulus.  That is not adequate or practical for a number

1    of reasons.

2              As GoodRx acknowledges, Prime and GoodRx

3    negotiated a three-year term for its contract with 180-day

4    notice of non-renewal.  That contract is not up until

5    September.  There is a 30-day termination notice for

6    breach, but Prime has not breached.  So it has a

7    negotiated 180-day notice of non-renewal.  Famulus is

8    contractually obligated to perform under that agreement

9    through its term.

10             In the Fourth Circuit's case, Feller v. Brock,

11   802 F.2d 722, a Fourth Circuit case cited in the parties'

12   briefing, the circuit court found that the district court

13   abused its discretion in issuing a preliminary injunction

14   that directly conflicts with another federal court's

15   injunction.

16             So where does that leave Prime?  If this

17   injunction award is confirmed, we don't have a matter to

18   practically seek recourse.  It can't go into court and

19   seek to enjoin breach of the agreement, to force

20   compliance with the parties' agreement until

21   September 21st, and/or enforce its 180-day notice period

22   it bargained for.  But then, according to GoodRx, Prime

23   also can't intervene in this case.  It practically impairs

24   Prime's ability to protect itself if not allowed to

25   intervene to challenge the injunction that is seeking to

1    be affirmed in this case.

2            And I know we already touched on this, but the

3    no adequate representation.  Mandatory intervention

4    requires showing that Prime's interests are not being

5    adequately represented.  The Supreme Court recently

6    re-emphasized --

7            THE COURT:  Let me ask you --

8            MS. BARRAGRY:  Yes.

9            THE COURT:  -- as to the substantial interest

10   argument, is there any Fourth Circuit case where a court

11   has allowed intervention in such circumstances presented

12   here upon a petition to vacate by a third-party who claims

13   the remedies ordered by the arbitrator in an arbitration

14   in which it was not a party will result in harm?

15           MS. BARRAGRY:  So, Your Honor, I don't think

16   that there is a case going either way in the Fourth

17   Circuit, which is why you're seeing a lot of cases cited

18   by both parties across the country on this issue.  It is a

19   very, very fact-specific issue.  And I will admit, I don't

20   think there is a case in front of you that is on all fours

21   factually and legally.  Legally, though, the principles

22   that are set forth support intervention in this case.

23           There's one case in particular that I think I'm

24   going to jump to because I think it's a good one in terms

25   of emphasizing that -- there's an argument that's threaded

1    through GoodRx's briefing about standing.  They challenge

2    that we don't have a claim and then try to say that we

3    can't have a claim overlapping in permissive intervention

4    because we don't have a claim.  Or they claim that we

5    can't have an interest in this case because we don't have

6    a legally protectable interest because we can't bring a

7    claim under the FAA.  So you kind of see it in a mandatory

8    and permissive intervention argument.  It's really a

9    standing argument.

10           So the Maxim case, that's a Fourth Circuit case,

11   actually says that legally protectable interest, you see

12   that in other circuits, not in this circuit though, that's

13   not what the standard is.  It doesn't need to be a, quote,

14   legally protectable interest.  It needs to be a

15   significantly protectable interest.

16           But then there's a case, a Supreme Court case.

17   So this is the Trbovich v. United Mine Workers of America

18   case, it's 92 S.Ct. 630.  Now, Trbovich is relied on by

19   the Fourth Circuit in Teague vs. Bakker, that's 931 F.2d

20   259.  That's a Fourth Circuit case from 1991.

21           So this is a case, the Teague case is a case

22   cited by both parties in their briefing.  But then it

23   relies on the Supreme Court case of Trbovich.  As I was

24   preparing for this hearing, I started looking at that

25   case.  And it's a great example of appropriate

1    intervention, even where an intervening party may not have

2    independent standing, just as the argument is today, but

3    under the FAA.

4              So in that case, the Secretary of Labor brought

5    a lawsuit under the Labor Management Reporting and

6    Disclosure Act to set aside the elections of officers of

7    the union.  Under the labor act at issue, the Secretary of

8    Labor had the exclusive right to challenge a union

9    election, and in fact did bring a lawsuit to challenge a

10   union election.  A union member sought to intervene to

11   present evidence and argument in support of the

12   secretary's election challenge.  The district court denied

13   the motion to intervene as a matter of right finding that

14   the act only allowed the Secretary of Labor to bring the

15   action, so the union member could not intervene.

16             That's the exact argument GoodRx makes as to why

17   Prime cannot intervene.  Because Prime wasn't a party

18   under the FAA, it can't intervene because it can't seek to

19   vacate.  Well, in Trbovich, on appeal the Supreme Court

20   reversed the district court's denial of intervention

21   stating that while the labor act didn't make any -- the

22   suit by the secretary, the exclusive post-election remedy,

23   quote, in this case petitioner seeks only to participate

24   in a pending suit that is plainly authorized by the

25   statute.  It cannot be said that his claim is defeated by

1    the bare language of the statute.  The Supreme Court then

2    went on applying Rule 24(a)(2), reversed the district's

3    court's denial of the union member's motion for

4    intervention and remanded it with the direction to allow

5    limited intervention.  So I think that case is really on

6    all fours in terms of interpreting this FAA argument, that

7    because we wouldn't independently have standing to seek to

8    vacate does not mean we can't qualify under Rule 24 to

9    intervene in an already existing motion to vacate, modify,

10   or alter the award.

11           Just briefly on the no adequate representation.

12   The Berger v. North Carolina State Conference of the

13   NAACP, 597 U.S. 179, that's a Supreme Court case from

14   2022.  And what that court said, the Supreme Court said

15   are where parties interests are similar, but not

16   identical, there is no presumption of adequate

17   representation, and that the required intervenors

18   demonstrate inadequate representation is a very minimal

19   burden.

20           Courts will often look to whether the party is

21   both capable and willing to make the same arguments as the

22   proposed intervenor.  And as we discussed, we think that

23   Famulus does not have the incentive to look at the way

24   that the injunction, if entered, would be entered.

25           Furthermore, Famulus doesn't have the access to

1    the harm that will incur to patients and to the health

2    plans if this is entered.  That is information that Prime

3    has as the PBM acting on behalf of the health plans and

4    these members.

5          For these reasons we believe Prime has

6    established it has the right to intervene in this action

7    and respectfully request the opportunity to do so.  But if

8    this Court finds mandatory intervention is not

9    appropriate, permissive intervention would also be

10    appropriate.

11          Federal Rule 24(b)(2) permits intervention if

12    the application is timely, if the claim or defense have a

13    common question of law or in fact, and if there's an

14    independent basis of subject matter jurisdiction, and

15    finally, intervention wouldn't unduly delay or prejudice

16    the adjudication of rights.  Under Fourth Circuit

17    precedent, Backus v. South Carolina, 2012 WL 406860,

18    intervention is to be construed liberally in favor of

19    intervention.

20          So we already discussed the element of

21    timeliness, so I'll move to the claim or defense must have

22    a question of law or fact in common.  Prime seeks to

23    vacate, modify, or alter the injunction award which,

24    obviously, shares common questions of fact with Famulus'

25    motion.

1          And we already talked about the Trbovich case,

2    but also it's worth pointing out again the Town of Chester

3    v Laroe Estates, a Supreme Court case from 2017, where the

4    Supreme Court instructed that a party seeking to intervene

5    need only meet the requirements of Article III standing if

6    it is pursuing relief that is different than requested by

7    a party with standing.  We're asking for relief under the

8    same statute and sections that are already before Your

9    Honor.  So independent standing is not required in order

10   to allow intervention.

11          As to the element of independent ground of

12   subject matter jurisdiction, the only challenge GoodRx

13   raised was to the issue of diversity of citizenship.  As

14   demonstrated in our responses to local interrogatories,

15   full diversity of citizenship exists between Prime and

16   GoodRx.  As noted at the beginning, the bigger issue is I

17   don't believe GoodRx or Famulus has established

18   jurisdiction between themselves.

19          And the final element of permissive intervention

20   is no undue delay or prejudice to the adjudication of

21   rights.  GoodRx never sought a preliminary injunction in

22   the arbitration.  And as you heard from the parties,

23   GoodRx and Famulus jointly requested a continuance of the

24   final hearing until just a few weeks ago, April 10th.

25   Famulus has recently sought relief to amend or modify the

1    award requesting a briefing schedule on that issue.  So we

2    don't think that there's a genuine argument to any undue

3    delay or prejudice by allowing us to intervene to speak to

4    these very real, very personal issues as to the costs of

5    medication to these members and health plans.

6            Prime will work cooperatively to meet a

7    reasonable briefing schedule.  And its intervention will

8    not unduly delay or prejudice GoodRx.  For these reasons

9    and the alternative to mandatory intervention, we would

10   respectfully request the opportunity to permissively

11   intervene in this action.

12           Now, finally, as a third alternative, Prime

13   requests amicus status.  MedsYourWay will be completely

14   shut down if Famulus is abruptly enjoined from supporting

15   it.  Prime, its members, and its clients are innocent

16   victims in this commercial dispute.  At a minimum, we

17   respectfully request Prime be given the opportunity to

18   submit an amicus brief on these very important issues.

19           Thank you, Your Honor.

20           THE COURT:  All right.  We're going to take a

21   three-minute recess before we start your argument.  Then

22   we'll go into the motion to seal.

23           MS. CROZIER:  Of course.

24           THE COURT:  We'll be at recess.

25       (WHEREUPON, a short break was taken.)

1          THE COURT:  Thank you.  Take your seats, please.

2     Yes, ma'am?

3          MS. CROZIER:  Good afternoon, Your Honor, and

4     thank you.  Jennifer Crozier, Weil Gotshal and Manges on

5     behalf of GoodRx, Inc.

6          Your Honor, I'd like to begin with Prime's

7     argument with respect to subject matter jurisdiction.

8     Famulus itself has asserted that there is complete

9     diversity in this action in its amended petition in

10    Paragraphs 1 and 3.  In Paragraph 1, Famulus asserted that

11    Famulus' members are citizens of South Carolina and

12    Connecticut.  And in Paragraph 3, Famulus asserted that

13    there is complete diversity between the parties to this

14    action.  So the parties to the action, GoodRx and Famulus,

15    agree that there is complete diversity.  And this Court

16    has held that subject matter jurisdiction exists under

17    such circumstances; and that is the Nanopure against

18    Pobiack (phonetic) case, 2021 WL 5903354 at 1, District of

19    South Carolina, February 12th, 2021.

20         Even, however, if there were any doubt on that

21    score, we can submit to Your Honor Good Roots filing with

22    the Connecticut Secretary of State, its annual report that

23    shows where the LLC is organized, the addresses of its

24    registered agents, the address of its principals.  And at

25    least one court here in the Fourth Circuit has found that

1    sufficient to establish diversity jurisdiction, and that

2    is Evans -- Evans, rather, against Centennial Holding, the

3    2021 WL 5893976 at 2, District of Maryland, March 25th,

4    2021.  And I have that filing, Your Honor, if you'd like

5    me to bring that up?

6            **THE COURT:**  Sure.  Do you have it for the other

7    side?

8            **MS. CROZIER:**  Yes.

9            **THE COURT:**  Okay.

10           **MS. CROZIER:**  And so again, Famulus itself has

11   asserted that its members are citizens of South Carolina

12   and Connecticut.  And there's complete diversity here.

13   GoodRx agrees.  And on that basis the Court can determine

14   that there is in fact subject matter jurisdiction.

15           Now, turning to the motion to intervene.  I'll

16   address each of Ms. Barragry's arguments in turn, but I'd

17   like to begin with two fundamental principles which I

18   think are dispositive of the issue here.  First, under the

19   plain terms of the FAA, Prime, a non-party to the

20   underlying arbitration, may not intervene to move to

21   vacate or modify or correct the award.  Sections 10 and 11

22   both say that the district court may make an order

23   vacating or modifying or correcting the award upon the

24   application of any party to the arbitration.

25           Now, Ms. Barragry said that there's no Fourth

1    Circuit authority on point, but I would respectfully

2    disagree.  Your Honor can look at Jones against Dancel,

3    792 F.3d 395 at Page 401, Fourth Circuit, 2015.  In that

4    case, the Fourth Circuit stated, A district court must

5    confirm an arbitration award unless a party to the

6    arbitration demonstrates that the award should be vacated

7    under one of the four enumerated grounds or for manifest

8    disregard of the law.

9           So there really is, GoodRx would submit, only

10   one outcome here.  The party to the arbitration; that is,

11   Famulus, has the heavy burden to show that the award

12   should be vacated under the four statutory grounds or for

13   manifest disregard of the law.  Famulus itself cannot meet

14   that burden.  So under Jones against Dancel, which

15   references the Supreme Court decision in Hall Street

16   Associates, which Your Honor cited in your recent docket

17   entry, this Court must affirm the award.

18          Nor can Prime intervene to litigate the merits

19   of the underlying arbitration, including the scope and

20   substance of the arbitrator's injunction.  That has been

21   done.  It was done in the context of the arbitration.  And

22   as my colleague, Mr. Lender, spoke about earlier, the

23   scope of review here is very narrow, among the narrowest

24   known at law.

25          GoodRx would, therefore, submit that Prime

1    cannot establish a significantly protectable interest here

2    and nor can it establish that it has a claim or defense

3    that shares with this action a common question of law or

4    fact.  And the Court can and should deny the motion to

5    intervene on those bases alone.

6            Now, to address Prime's arguments in both its

7    reply brief and that of Ms. Barragry's presentation today.

8    Prime first argues --

9        **THE COURT:**  Let me ask you.  Are you aware of

10   any Fourth Circuit case denying intervention by a

11   non-party who seeks to raise issues as to the harm it will

12   suffer from the injunction ordered by the arbitrator?

13       **MS. CROZIER:**  Any Fourth Circuit case that

14   denies -- well, no, Your Honor, not standing here today.

15   But again, the Fourth Circuit in Jones against Dancel said

16   the court must confirm unless a party to the arbitration

17   satisfies the four enumerated grounds in the FAA.

18           And I think, too, if we look at the cases that

19   Prime cites in support of its argument, those cases prove

20   GoodRx's point here.  We can start with the Contracting

21   Plumbers case, which is a Second Circuit case from 1988,

22   841 F.2d 461, cited by Prime in their reply brief at

23   Page 4.  In that case, the Second Circuit allowed a

24   non-party to intervene to move to vacate only because the

25   party faced an existential threat if it were not allowed

1    to intervene to move to vacate.  And the Southern District

2    of New York has since described that case as an outlier

3    and talked about the fact that it should be applied only

4    very rarely.  Prime here doesn't articulate any such harm.

5    It doesn't say that it itself is going to face an

6    existential threat if not allowed to intervene to move to

7    vacate.

8         Frere against Orthofix, 2002 WL 1543857 at 3,

9    Southern District of New York, July 15th, 2002, cited by

10   Prime in their reply brief at Page 4.  The district court

11   in that case relying on Contracting Plumbers, most of

12   these cases are the fruit of Contracting Plumbers, merely

13   assumed for purposes of a motion to vacate that

14   non-parties have standing to intervene and then concluded

15   that the non-parties failed to establish a credible basis

16   for vacating the award.

17        **THE COURT:**  Is there no threat to Prime from

18   closure of the MedsYourWay program?

19        **MS. CROZIER:**  No, Your Honor, there is not.

20   Prime hasn't argued that it itself will go out of

21   existence if MedsYourWay is enjoined.  And let me talk

22   about that point because we've heard a lot about it today.

23   One thing I want to underscore is that what we're talking

24   about here, this integrated cash solution, it's a drug

25   discount coupon integrated with a patient's funded benefit

1     at the point of sale.  So what we're talking about here is

2     a coupon.  You could hold one in your hand or you could

3     use this integrated cash technology to integrate it with

4     an insurance benefit at the pharmacy counter, which is

5     what GoodRx does, and what Famulus learned to do based

6     upon our confidential information.

7            So what Prime is really talking about here is

8     that if the injunction is entered, it's members' coupons

9     may run out.  And some patients may have to pay more for

10    their prescriptions than they were previously, consistent

11    presumably with what they were paying before the program

12    went into effect.  That is far from the significantly

13    protectable interest that's required under Rule 24(a).  We

14    are talking here about a coupon potentially running out.

15           And to address another argument that

16    Ms. Barragry made, Prime has had more than enough time to

17    prepare to shift away from its reliance on the technology

18    that Famulus built based upon our confidential

19    information.  Prime has known about this dispute for at

20    least seven months.  And that's seven months to prepare

21    for the possibility that Famulus might not be able to

22    continue to serve Prime.  And even now, it's been more

23    than two months since the injunction became effective.

24    And you have counsel for Prime standing up here saying

25    there's nothing we can do.

1          But you heard Ms. Barragry admit that in the

2     agreement between Prime and Famulus, they negotiated for a

3     30-day termination for cause and 180-days termination for

4     convenience, which means that the parties themselves

5     determined that six months would be enough in order to

6     address any issues related to the stoppage of this

7     program.

8          And so again -- and again, during the

9     arbitration hearing, the arbitrator directly asked

10    Mr. Szwajkos, What would happen if Famulus would be

11    enjoined?  And Mr. Szwajkos explained, and we cite to this

12    in our papers, that other systems would kick back into

13    place and Prime could return to its pre-Famulus status

14    quo.

15         Now, I know that Ms. Barragry stood up here and

16    said something different, Your Honor.  But lawyer argument

17    isn't evidence.  And we presented substantial evidence in

18    our papers of a whole mountain of evidence the arbitrator

19    heard about Prime, about Prime's technology, about the

20    relationship between Famulus and Prime.  That wasn't the

21    only evidence the arbitrator considered.  There was a

22    great deal of evidence considered.  And we have a very

23    long string cite in our brief with exhibits appended on

24    Page 17 of our opposition to Famulus' motion to vacate.

25         Now, going back to whether Prime may intervene

1    to move to vacate, again, the cases -- the cases to which

2    Prime cites in support of its argument, they prove our

3    point.  And the only two cases in which a non-party was

4    actually permitted to intervene, again, one faced an

5    existential threat and the other was liable for a million

6    dollars as a result of the award.  That's the new case

7    that Prime cites, Westra Construction against Fidelity and

8    Guarantee Co., 2006 WL 1149252 at Page 2, the Middle

9    District of Pennsylvania, April 28th, 2006.

10          Now, Prime again argues that it need only show,

11   pardon me, that it has a significantly protectable

12   interest in these proceedings, not a legally protectable

13   one.  Three responses to that point, Your Honor.

14          First, we can point the Court to half a dozen

15   cases here in the Fourth Circuit in which courts after

16   Teague have required that proposed intervenors have a

17   direct, substantial, and legally protectable interest.

18   American College of Obstetricians against The United

19   States, 467 F. Supp. 3d at -- 282 at 289, District of

20   Maryland, 2020.  City of Norfolk against Commonwealth of

21   Virginia, 2020 WL 6330050 at 4, Eastern District of

22   Virginia, January 10th, 2020.  RLI Insurance Co. against

23   Nexus Services, 2018 WL 5621982 at 3, Western District of

24   Virginia, October 30th, 2018.  Lantern Business Credit

25   against Alianza Trinity Development Group, 2016 WL 6594117

1    at 3, Western District of North Carolina, October 11,

2    2016.  Lewis against Excel Mechanical, 2013 WL 3762904 at

3    2, District of South Carolina, July 16th, 2013.  And

4    Genesis Press, Inc. against Mac Funding Corp., 2008 WL

5    4695114 at 1, District of South Carolina, October 23rd,

6    2008.  So there are several cases that have held that a

7    proposed intervenor must have a legally protectable

8    interest in order to intervene.

9         Second, however, we state quite clearly in our

10   opposition that Prime must have a significantly

11   protectable interest.  And then we go on to say that a

12   significantly protectable interest is one that's direct,

13   substantial, and legally protectable.

14        Now, our position is that's consistent with this

15   Court's articulation of the standard in Bishop of

16   Charleston against Adams, 2021, in which the court stated

17   that a significantly protectable interest is one that is

18   direct and substantial, and one where the proposed

19   intervenor stands to gain or lose by the direct legal

20   operation of the district court's judgment.

21        So when we say Prime must have a legally

22   protectable interest, what we mean is that Prime itself

23   must stand to gain or lose by the direct legal operation

24   of the district court's judgment.  Here, Prime has

25   articulated no such harm.  Prime can't credibly argue that

the fact that its members' coupons may run out, and that,
again, that's what we're talking about here, gives it a
legally protectable interest to intervene.

And then finally, Your Honor, whether one uses
the term legally protectable or not, it doesn't matter
because, again, Prime, as a non-party to the underlying
arbitration, cannot intervene to move to vacate, modify,
or correct the award.  It can't intervene to relitigate
the merits.  So Prime, quite literally, has nothing to do
in this vacatur confirmation action other than delay
enforcement of the award.  And the Court should therefore
deny intervention.

Now, next Prime argues relying on Town of
Chester against Laroe Estates, 581 US 433, 2017.  Prime
argues that it's not required to establish Article III
standing because it seeks the same relief as Famulus.  But
in Town of Chester, the Supreme Court held that an
intervenor of right must have Article III standing in
order to pursue different relief from that which is sought
by a party with standing.

Now, Prime argues that this holding necessarily
means that a proposed intervenor need not demonstrate
Article III standing so long as it's seeking the exact
same relief as a party to the action.  But a number of
federal courts have pointed out, and I'll quote from one

1    decision, Your Honor, if I may, that the Supreme Court in
2    Town of Chester did not consider whether all intervenors
3    of right must demonstrate their own Article III standing.
4    But instead, only considered whether an intervenor of
5    right who seeks distinctive relief must demonstrate its
6    own Article III standing.  And that's Sierra Club against
7    Entergy Arkansas, 503 F. Supp. 3d 821, at 849 to 50,
8    Eastern District of Arkansas, 2020.  And then also a
9    similar conclusion in Old Dominion Electric Co-op against
10   FERC, 892 F.3d 1223, 1232 to 33 at Note 2, the DC Circuit,
11   2018.  And certiorari was denied in that case in 2019.

12         So our position is Prime must have standing to
13   do something in this action, but it doesn't.  It can't
14   move to vacate.  It can't relitigate the merits of the
15   underlying arbitration.  And it claims it isn't seeking to
16   do anything else.

17         Now, again, Prime argues if it must establish
18   standing, it can because it has standing to move to vacate
19   the award.  We've discussed that already.  The cases upon
20   which Prime relies are easily distinguishable and in fact
21   prove GoodRx's point.

22         So I'll turn to Prime's next argument, which is
23   that GoodRx is not entitled to a presumption of adequate
24   representation.  And that in any event, Famulus doesn't
25   adequately represent Prime's interests.

1              Well, here, Your Honor, Prime is speaking out of

2      both sides of its mouth.  On the one hand in support of

3      its standing argument, it says we seek the same relief as

4      Famulus.  That's in its reply brief at Page 2.  On the

5      other hand in support of its adequate representation

6      argument, it says we seek relief that is different from

7      Famulus or not identical with.  That's in its reply brief

8      at Page 5.

9              Prime can't have it both ways.  Either it seeks

10     the same relief and there's a presumption of adequate

11     representation, in which case it would have to show

12     adversity, collusion, and non-feasance, or non-feasance to

13     overcome that presumption, or it seeks different relief.

14     And under its own interpretation of the law, it has to

15     establish standing.

16             In any event, even -- there's clearly adequate

17     representation here.  And I did want to address one

18     comment that Ms. Barragry made.  She said that the

19     non-identical interest that it has in this vacatur

20     confirmation action is that Famulus doesn't care about the

21     injunction, only Prime cares about the injunction.  But we

22     just heard Ms. Farnsworth stand up and speak about the

23     injunction for several minutes, including in a rebuttal

24     presentation.  So I think the suggestion that Famulus

25     itself doesn't care about the injunction is belied by

1    Famulus' counsel's presentation to the Court today.

2            In any event, again, there's clearly adequate

3    representation here.  The parties have the same objective,

4    which is to vacate, modify, or correct the award.  They

5    have the same arguments, which again, in our view are weak

6    arguments.  Because the arbitrator did hear significant

7    evidence concerning Prime and its relationship with

8    Famulus and its technology during the course of the

9    arbitration.  But again, the argument there is that

10   somehow the arbitrator refused to consider information

11   about Prime.  That's not accurate.  And they have the same

12   perspective.  Prime's perspective appears to be based on

13   communications it's had with Famulus.  Indeed, Famulus is

14   better placed to make the arguments that Prime seeks to

15   make because it was actually there during the arbitration

16   proceedings and in the hearing.  So again, Your Honor,

17   we'd argue there's plainly adequate representation of

18   interests here.

19           Now, next Prime argues that it would suffer

20   great prejudice if it were not allowed to intervene.

21   We've talked about that already.  This is a drug discount

22   program.  The harm that Prime articulates -- the harm that

23   Prime articulates is in our view remote and speculative.

24   Because if the injunction is entered, and we submit it

25   should be, then members' coupons may run out.  Some

1   members may pay some amount more for their prescriptions

2   for some period of time and, again, consistent presumably

3   with what they were paying before.

4          I also do want to point out that although

5   millions of patients have their prescriptions run through

6   the MedsYourWay program, based on the evidence presented

7   during the arbitration, only a small percentage actually

8   receive their prescriptions at lower costs.  So if you

9   don't mind, I'll take a quick moment to talk about how

10  this works.

11         So, the integrated cash program effectuates a

12  comparison between a funded benefit and between a funded

13  price and the discount price.  And if the funded price is

14  higher, then the discount price loses.  If the discount

15  price is lower, then -- make sure I'm -- if the discount

16  price is lower than the funded price, we refer to that as

17  a won claim, the claim is won by the discount card vendor.

18  Not every claim is won by the discount card vendor.  The

19  evidence produced in the arbitration and heard during the

20  arbitration indicates that only a very, very small number

21  of claims are actually converted to the discount price

22  from the funded price.

23         Okay.  Finally, Your Honor, Prime argues that if

24  the Court denies mandatory intervention, it should allow

25  permissive intervention.  And Prime articulates two, what

1    it refers to as, common questions of law or fact.  First,

2    whether the arbitrator committed misconduct by failing to

3    consider evidence necessary to issue a fair and well

4    reasoned award.  And second, whether the arbitrator

5    exceeded her powers by issuing an award that substantially

6    impacts third-party rights.  And that's at Prime's

7    memorandum of law in support of its motion to intervene at

8    Pages 20 and 21.

9         But Rule 24(b) permits intervention at the

10   Court's discretion only where the proposed intervenor has

11   a claim or defense it shares with the main action, a

12   common question of law or fact.  And these are not

13   questions that relate to any claim or defense that Prime

14   itself has.  Prime is attempting to argue that the award

15   or the injunction should be vacated pursuant to Section 10

16   of the FAA.  And under the plain terms of the FAA, and we

17   would submit the Fourth Circuit's decision in Jones

18   against Dancel, it cannot do that.  And so, accordingly,

19   the Court should deny permissive intervention.

20        Beyond that, Your Honor, permissive intervention

21   isn't appropriate if the intervention would delay the

22   proceedings or prejudice the parties to the arbitration.

23   And we haven't heard much about this today, but it's a

24   really, really important point.

25        The arbitrator found that Famulus breached the

1    agreement between the parties by misusing our confidential

2    information to develop a competing technology, which it

3    then sold to Prime in violation of the exclusivity

4    provisions of the agreement.  The arbitrator, as

5    Mr. Lender mentioned, awarded damages to remedy past harms

6    and an injunction to prevent future harms.

7            Notwithstanding that injunction, notwithstanding

8    those findings, Famulus continues to offer this, what I

9    will call, a copycat technology to Prime today in

10   violation of the injunction.  And it continues to market

11   its copycat technology on its website today in violation

12   of the injunction.

13           So even though an arbitrator found that Famulus

14   breached its agreement with GoodRx, Famulus continues to

15   actively compete with us in the marketplace.  Moreover,

16   with each passing day, we suspect it will become more and

17   more difficult to collect -- to enforce the award and to

18   collect on the judgment or the award that the arbitrator

19   issued.

20           Further, Prime's intervention would require

21   GoodRx to address issues that it wouldn't have had to

22   litigate otherwise.  I've already stood up here and spoken

23   to you about the nature of Prime's technology, and the

24   harms to -- the potential harms to members, and the

25   differences between the two technologies, how many are

1    actually getting savings under the drug discount coupon,

2    the extent to which members are even aware of the benefit.

3    You heard Ms. Barragry say most members aren't even aware

4    that they're getting this benefit.  These are all things

5    that we wouldn't have to litigate otherwise.  They really

6    are not relevant at all to the Court's job here in this

7    confirmation or vacatur proceeding.  Again, we've got four

8    narrow statutory grounds.  We've got manifest disregard of

9    the law.  All of these issues are totally collateral

10   issues.  And GoodRx would be prejudiced to have to -- to

11   litigate those here when it would not otherwise.

12        And then finally, I know I said finally before,

13   but never trust a lawyer when she says finally, this is

14   the last finally.  With respect to the amicus brief,

15   amicus briefs have been allowed at the trial level where

16   they provide helpful analysis of the law, the amicus has a

17   special interest in the subject matter of the suit, or

18   existing counsel is in need of assistance.

19        Here, Prime does not and cannot offer -- or

20   rather it does not purport to provide helpful analysis of

21   the law.  Vacating awards is narrow and that law is very

22   well established.  We submit Prime does not have a special

23   interest because it cannot intervene to move to vacate and

24   it cannot intervene to relitigate the merits of the

25   underlying arbitration.  And Prime hasn't suggested that

1    Famulus' counsel is in need of assistance.

2         And so, again, our position is intervening as an

3    amicus here wouldn't be useful to the Court.  And

4    moreover, it would delay the proceedings and prejudice

5    GoodRx for all the reasons that we've discussed.  We have

6    additional briefing.  And so for all of those reasons,

7    Your Honor, including those set forth in our papers, we

8    submit that the motion to intervene should be denied.

9    (Pause.)

10         **THE COURT:**  All right.  So I'm going to try to

11   organize the review of these documents.  It's going to be

12   a high level, not getting the into the weeds.  And I'm

13   going to ask y'all to group some of the arguments because,

14   honestly, I don't have time to go into a whole lot of

15   weeds here on these here this afternoon.

16         So I'm looking at Exhibit Nos. 2, 3, and 4.  Can

17   y'all -- do y'all have something there?  Can y'all refer

18   to your exhibit numbers?  It's Entry No. 29-3 and it's

19   filed by Famulus.  Have y'all got that handy?

20         **MS. FARNSWORTH:**  We didn't hear the first part

21   of what you said, Your Honor.  You said Famulus?

22         **THE COURT:**  Famulus, yes.  29-3, the

23   non-confidential exhibit index to Exhibit A.  I'll let

24   y'all find that.

25         So let me ask y'all this before we even -- does

1    Prime need to be excused because they weren't party to

2    these -- I think Prime should probably be excused at this

3    point because of the confidentiality.

4          MS. BARRAGRY:  Understood, Your Honor.

5          THE COURT:  And I'm done hearing their

6    arguments.  But if y'all have some argument that they need

7    to stay here, I can't imagine what it would be.

8          MS. FARNSWORTH:  I don't have any argument, Your

9    Honor, unless you want to hear.

10          THE COURT:  I'd love to have them.  I could

11   offer them some tea or a Coke or something like that.  But

12   I just don't see where there's any good reason for them to

13   be here at this point.  And I don't want to hear anymore

14   argument on the motion to intervene.

15          MS. BARRAGRY:  Understood, Your Honor.

16          MR. FLYNN:  Thank you, Your Honor.

17          THE COURT:  Thank y'all.

18        (Prime and their counsel left the courtroom.)

19          MS. FARNSWORTH:  Your Honor, we have exhibit --

20   we have an Exhibit 4.  We don't have a 29.3.

21          THE COURT:  Entry No. 29-3 filed March 27th,

22   2024, motion to seal.  I've got exhibit number,

23   descriptions, ECF No. 29-3.

24          THE CLERK:  It's Exhibit B.

25          MS. FARNSWORTH:  To our motion to vacate?

1        **THE COURT:**  I can show it to you if you want to

2    come look at it.  It's the second motion to seal that

3    y'all filed.

4        **MS. VRIESINGA:**  Yes, Your Honor.

5        **THE COURT:**  Have y'all got it?  Because I'm

6    looking at it and I'm going to ask y'all to look at it.

7        **MS. FARNSWORTH:**  Your Honor, we don't have a

8    copy of it.  We have it on our laptop somewhere.

9        **THE COURT:**  All right.

10       **MS. FARNSWORTH:**  But Ms. Vriesinga is prepared

11   to address the motion to seal argument.

12       **THE COURT:**  All right.  I'm just trying to make

13   sure everybody has something to look at if they want to.

14       **MS. FARNSWORTH:**  We have everything else you

15   could possibly want.

16       **THE COURT:**  We're going to try to pull it up for

17   you.

18       **THE CLERK:**  Ms. Crozier, do you have the list?

19       **MS. CROZIER:**  I do.

20       **THE COURT:**  Okay.  So got it there,

21   Ms. Farnsworth?

22       **MS. FARNSWORTH:**  I have an index of

23   non-confidential exhibit index to Exhibit A, yes.

24       **THE COURT:**  That's what I want to look at.  And

25   I want to ask y'all to confirm these are the documents or

1   not, that these are the documents that Famulus contends

2   should be sealed and GoodRx says should not be sealed.

3   Correct?

4           MS. VRIESINGA:  That's correct.  It's not all of

5   the exhibits enumerated in the confidential index, it's

6   some of them.

7           THE COURT:  So these are the ones that I see are

8   in dispute.  And it would be Exhibit Nos. -- I'm doing

9   them in groups, 2, 3, and 4, injunction order dated

10  February 16, 2024.  Y'all following me?

11          MS. VRIESINGA:  Yes.

12          THE COURT:  Costs ordered dated February 16,

13  2024, and consent protective order; correct?

14          MS. VRIESINGA:  Yes.

15          THE COURT:  Now I don't want to hear any

16  argument yet.  I want to jump down to Exhibit Nos. 11 and

17  12, consent scheduling order dated May 4th, 2023, and

18  notice of hearing, Exhibit No. 12.  Y'all following me?

19          MS. VRIESINGA:  Yes.

20          MS. CROZIER:  Yes.

21          THE COURT:  And then Exhibit Nos. 20, 21, and

22  22.  20 is executed subpoenas dated November 10, 2023;

23  consent scheduling order dated September 5, 2023; and

24  No. 22 is consent scheduling order dated October 26th,

25  2023.  Y'all see that?

78

1          MS. VRIESINGA:  Yes.

2          THE COURT:  Okay.  And then next I've got

3     Exhibit No. 31, arbitrator email of November 5, 2023, and

4     Exhibit Nos. 37 and 38, arbitrator emails of November 15

5     and November 26, 2023.

6          Moving on to Exhibit Nos. 39 and 40, Prime

7     letter of November 20, 2023, and No. 40, email thread of

8     November 17, 2023, and November 20, 2023.  Y'all agree

9     that all those are in dispute?

10          MS. VRIESINGA:  Yes.

11          THE COURT:  Okay.  And then No. 42, Puls' email

12     of November 26th, 2023, correct?  Y'all agree there?

13          MS. CROZIER:  Your Honor, actually if I may?  I

14     think there's really only two documents that are in

15     dispute here, and those are Exhibits 2 and 3.  We only --

16     we only dispute that the injunction order and the costs

17     order should be -- in our view they should be unsealed for

18     reasons that we're prepared to argue.  With respect to the

19     rest of the documents, Your Honor has sealed them and we

20     are fine if they remain under seal.

21          THE COURT:  All right.  I'm just trying to make

22     the record clear; and that is, that the parties then agree

23     based on our interaction now that Exhibits 1 through 63

24     all remain sealed except for No. 2 and 3.  Is that where

25     we're at?

1          **MS. VRIESINGA:**  Subject to the Court's decision

2    regarding No. 2 and 3.

3          **MS. CROZIER:**  Yes, Your Honor.

4          **THE COURT:**  In agreement?  Okay then.  All

5    right.  So I'll hear you on No. 2 and 3.  Y'all can draw

6    straws.

7          **MS. CROZIER:**  All right, Your Honor, I will -- I

8    will try to be brief.  So there's a common law right to

9    copy and inspect judicial records, In Re: Knight

10   Publishing Co., 743 F.2d 231 at 235, Fourth Circuit, 1984.

11   The district court may, however, in its discretion seal

12   documents if the public's right of access is outweighed by

13   competing interests.

14          Now, as a party seeking to seal these two

15   documents -- and again the first document is the

16   injunction order about which we've heard a fair amount

17   today, and the second document is the costs order.  As the

18   party seeking to seal these documents, Famulus has the

19   burden to show that the orders contain confidential

20   information, that disclosure of them would harm them, and

21   that that harm outweighs the public interest in access to

22   the documents.  And that's Virginia Department of State,

23   386 F.3d 567, Fourth Circuit, 2004.

24          Now, neither of these documents contains any

25   highly confidential information that if disclosed to the

1    public would competitively disadvantage Famulus.  The

2    injunction order, which is Exhibit 2 on the list we were

3    just referencing, it only states what Famulus must and

4    must not do.  There is no, and Famulus can point to none,

5    confidential information in this document that if

6    disclosed to the public would result in any harm to

7    Famulus.  The fact that the order indicates that Famulus

8    has engaged in wrongdoing is not a basis to seal the

9    document.  And that's Tustin against Motorists Mutual

10   Insurance Co., 668 F. Supp. 2d 755, the Northern District

11   of West Virginia, 2009.

12        And the same is true with respect to the order

13   granting GoodRx's motion for costs.  Again, simply

14   awarding costs, there is absolutely no highly

15   confidential, competitively sensitive information in this

16   document that outweighs the presumption of public access

17   that attaches to these two documents.

18        Now, Famulus makes a number of arguments in an

19   effort to keep these documents from the -- from public

20   disclosure.  And one of those is that these documents were

21   governed by the parties' consent protective order that was

22   entered in the underlying arbitration.  But that is

23   plainly not true.  The consent protective order, which is

24   Exhibit 4 in the index of documents that we were just

25   referencing, by its very terms only applies to records of

1    information in this arbitration designated pursuant to

2    this protective order, including all designated deposition

3    testimony, all designated testimony taken at a hearing or

4    other proceeding, all designated deposition exhibits, all

5    documents produced, and other discovery materials

6    including interrogatory answers, so on and so forth, which

7    contain confidential, proprietary, or sensitive

8    information.

9              **THE COURT:**  Did I hear at the outset that it's

10   your position that common law right of access applies to

11   these two documents not the First Amendment right?

12             **MS. CROZIER:**  Yes, Your Honor.  And I would

13   point -- I would point Your Honor to Blackbaud against IBM

14   Corporation, 2021 WL 4776287 at 1, Southern District of

15   New York, 2021.  Petitions to confirm arbitration awards

16   and their attendant memoranda of law and supporting

17   documents are judicial documents that directly affect the

18   court's adjudication of the confirmation petition and such

19   documents are subject to the presumption of public access.

20   And again, Famulus has the burden to show or to overcome

21   that presumption of public access.  And our position is

22   that it has not.  And the parties certainly didn't agree

23   in the consent protective order that a costs order or an

24   injunction should remain sealed on the public docket.

25             One additional argument, Your Honor, the

1    injunction by its own terms envisions that the outcome of

2    the arbitration will be public.  As Ms. Farnsworth

3    referenced, the arbitrator directed Famulus to notify

4    certain third parties that it was no longer permitted to

5    offer its integrated -- it's fast technology.  Again,

6    something that we understand Famulus has not done.  And to

7    the extent we are going to enforce this award, Your Honor,

8    these documents have to be public.  The injunction has to

9    be public in order for us to adequately enforce it.  And

10   again, the injunction itself contemplates that it would be

11   public.

12           And finally, there is a significant public

13   interest in this document and need for this information to

14   be public.  Because third parties, who are doing business

15   with Famulus or who may be doing business with Famulus,

16   have a right to know whether their mutual business

17   activity is subject to the injunction.

18           Your Honor, subject to any questions you may

19   have, I'm finished with that argument.

20           **THE COURT:**  Hang on one second.  So let me just

21   ask you.  Am I correct that you wouldn't agree to a less

22   drastic remedy of redacting the parties named in Paragraph

23   8 of the injunction?  (Pause.)

24           **MS. CROZIER:**  As long, Your Honor, as we're

25   still able to enforce that paragraph of the injunction by

1    ensuring that Famulus has in fact notified these entities

2    that it's no longer permitted to offer its fast

3    technology, then we would agree to that.

4              THE COURT:  Well, they're required to notify you

5    of the same per the arbitration ruling.

6              MS. CROZIER:  That's right.  So that would seem

7    to be adequate under the circumstances.

8              THE COURT:  And copy you on correspondence.

9              MS. CROZIER:  That's right.

10             THE COURT:  All right.

11             Yes, ma'am?

12             MS. VRIESINGA:  Thank you, Your Honor.

13             THE COURT:  I'd say good morning, but it's

14   afternoon.

15             MS. VRIESINGA:  Good afternoon.  And thank you.

16   On the issue of sealing, Famulus has filed two motions to

17   seal in this case.  One was in connection with its

18   original petition to vacate.  And then another was in

19   connection with its amended petition to vacate.  And

20   together, with GoodRx, both parties have moved to seal in

21   excess of a hundred exhibits in this case and for good

22   reason.  This is because the exhibits contain confidential

23   information and/or they were generated during the course

24   of an underlying arbitration proceeding, which was a

25   confidential proceeding, and treated as such by the

1     parties from inception to completion without exception.

2          GoodRx now argues that certain exhibits are not

3     confidential and should not be sealed.  Specifically, it

4     seems that the issues have been narrowed to the injunction

5     order and the cost order.  As a preliminary matter, this

6     Court via Docket Entry Order 27 I believe in the GoodRx v.

7     Famulus matter, directed the Clerk of Court to seal those

8     very same exhibits.  Those were Exhibits C and D to their

9     petition to confirm.

10          But beyond that, the injunction order should be

11    sealed because it does in fact contain commercially

12    sensitive information as to Famulus, including its

13    confidential business practices and confidential business

14    relationships with a variety of third parties who are

15    identified by name in the order and who in no way played a

16    role or participated in the underlying arbitration

17    proceeding.  That is exactly the type of commercially

18    sensitive confidential information that this Court has

19    found to warrant sealing.

20          As an additional matter, these orders emanate,

21    as I mentioned, from a confidential arbitration

22    proceeding.  That is part of what -- well, the pleadings,

23    every basically exhibit in this case was marked

24    confidential, if not highly confidential.  No party

25    deviated from the fact that they wanted this proceeding to

1    be confidential.

2        The fact that the FAA affords parties

3    confidentiality and privacy protections is one of the

4    things that attracts people to an arbitration proceeding

5    in the first place.  An arbitration proceeding

6    contemplates that at the very end the winning or losing

7    party is going to seek confirmation or vacatur of the

8    award in a state or federal courts.  So it doesn't render

9    all of the confidential protections that were available to

10   the parties during the arbitration and nullity because if

11   that were the case, what's the point in having those

12   protections in the first place?

13       Also, important here is the fact that these two

14   exhibits are the precise exhibits in conjunction with the

15   arbitration final award that Famulus is seeking to vacate

16   and/or modify, either under Section 10 of the FAA or

17   Section 11.  The fact that these exhibits are the ones

18   that Famulus is saying are invalid, they're invalid for

19   all of the grounds set forth in its vacatur petition.

20   We've asserted, I believe, four grounds under the FAA plus

21   the common law man test disregard of the law (phonetic).

22   Plus we filed a Section 11 challenge, which essentially

23   GoodRx has conceded modification is necessary because

24   there is an inconsistency when looking at the two

25   documents specifically, the final award and the injunction

1    order.

2           And for that reason, these orders as they

3    currently stand are just arbitration orders.  They don't

4    have any force and effect, as is noted in the final award

5    itself, until they are confirmed in a court of competent

6    jurisdiction.  If in the event Famulus was successful in

7    its vacatur action or modification action, and these

8    awards are vacated or modified, there is no reason

9    whatsoever to inject disinformation into the public domain

10   at this point.  The harm that will be suffered by Famulus

11   is irreparable and can never be clawed back.

12          So for those reasons, Your Honor, we request

13   that our motion to seal be confirmed in entirety,

14   especially as it pertains to the two orders at issue.

15          **THE COURT:**  One second.  Let me just ask you

16   what I asked counsel for GoodRx and that is this.  Is it

17   your position that the common law right of access applies

18   and not the First Amendment right to all these documents

19   you wish to seal?

20          **MS. VRIESINGA:**  Your Honor, I would argue that

21   the confidentiality provisions afforded by the AAA extend

22   to this proceeding unless and until those filings, those

23   orders are confirmed by this Court.  For public policy

24   reasons, that would be the reason to support sealing those

25   documents at this juncture.  They are subject to

1   challenge, a valid, legitimate challenge on behalf of

2   Famulus that they are unenforceable.  They are invalid.

3   They should have never been written as they are.  And as

4   such, the public has no interest in seeing these orders

5   until -- unless and until they are confirmed by this

6   Court.

7              THE COURT:  And as to the non-party, third-party

8   names noted in Paragraph 8 of the injunction that you

9   mentioned, GoodRx just confirmed on the record that they

10  would agree to redact those names.  So as to the

11  injunction, do you all agree to this less drastic remedy

12  or are you still arguing for sealing of the injunction in

13  its entirety?

14             MS. VRIESINGA:  We would still be arguing for

15  sealing of the injunction in its entirety.  It's not just

16  the fact that the injunction order, I think it's somewhere

17  towards the end of the order, identifies by name all of

18  these relationships, these commercial business

19  relationships that Famulus has with named parties that are

20  subject to confidentiality provisions in their respective

21  contracts.

22             But more than that, when you go to Paragraph 1

23  and 2 of the injunction order, the arbitration -- the

24  order goes to great lengths describing Famulus' businesses

25  practices.  The first paragraph defines what's a

1    prohibited business.  So what is Famulus doing that it

2    can't do?  And then it goes on and overbroadly defines

3    what technology Famulus is offering in terms of solution.

4         So Paragraphs 1, 2, and then the paragraph

5    dealing with the relationships with third parties would

6    all have to be redacted.  But that still doesn't alleviate

7    the concern that the harm to Famulus should it prevail in

8    its modification challenge or vacatur challenge could

9    never be undone if it prevailed on those issues.  That

10   information would be out in the public domain and there

11   would be no way to remedy the reputational damage to

12   Famulus.

13        **THE COURT:**  All right.  Let me see if -- thank

14   you -- if GoodRx has anything in response?

15        **MS. VRIESINGA:**  Thank you.

16        **MS. CROZIER:**  Your Honor, very briefly on

17   whether the common law or First Amendment right of access

18   applies.  The first -- the Fourth Circuit has held that

19   the First Amendment right of access most often applies in

20   criminal proceedings, but it can apply in civil

21   proceedings in connection with a summary judgment motion

22   or at trial in a civil case.  And that's why we contend,

23   Your Honor, that the common law right of access applies

24   here because GoodRx's petition to confirm the award does

25   not relate to a motion for summary judgment.

1          If, however, the First Amendment right of access

2     applied, it would even -- it would be even more difficult

3     for Famulus to establish that these documents should be

4     sealed.  Because there, they would have to show a

5     significant harm to outweigh this very significant right

6     of access to this information.

7          And again, there's nothing, nothing in these

8     documents that constitutes highly competitive,

9     confidential information that, if disclosed, would somehow

10    competitively disadvantage Famulus.  You do hear Famulus

11    asserting conclusorily that if this document were publicly

12    disclosed it would result in irreparable harm.  But

13    there's been no specific indication of what that harm

14    might be.  And so Famulus cannot satisfy its burden as the

15    moving party to show that these documents should be sealed

16    and access to the public should be denied.  Thank you.

17         **THE COURT:**  Okay.

18         Thanks to everyone.  I'm going to take it all

19    under advisement.  Appreciate all the great briefing, both

20    sides arguing, and your general civility, at least as far

21    as I can tell.  I'll issue a written order at some point.

22    Thank you.

23         **MS. FARNSWORTH:**  Thank you, Your Honor.

24         **MS. CROZIER:**  Thank you, Your Honor.

25         **MR. LENDER:**  Thank you, Your Honor.

1          **MR. LIVOTI:**  Thank you, Your Honor.

2          (WHEREUPON, court was adjourned at 1:25 PM.)

3                           * * *

4     I certify that the foregoing is a correct transcript from

5     the record of proceedings in the above-entitled matter.

6          s/Karen E. Martin                5/25/2024
     _____          _____
7     Karen E. Martin, RMR, CRR          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25