1                          BEFORE THE
                 AMERICAN ARBITRATION ASSOCIATION
2

3                     TRANSCRIPT OF PROCEEDINGS
                   NOVEMBER 30, 2023, VOLUME 4
4

5    IN THE MATTER OF THE ARBITRATION BETWEEN:

6    _____

7    GoodRx, Inc.,

              Claimant,
8

9         vs.                 CASE NO. 01-23-0000-5919

10

11   Famulus Health LLC,

              Respondent.
12   _____

13

14   TIME:                 9:02 A.M.

15   LOCATION:             THE WESTIN HILTON HEAD ISLAND
                           RESORT & SPA
16                         HILTON HEAD ISLAND,
                           SOUTH CAROLINA
17

18

19

20   REPORTED BY:          TERI L. KENNELLY, RPR, CRR
                           CLARK BOLEN
                           CHARLESTON, SC 29415
21                         843-762-6294
                           WWW.CLARKBOLEN.COM
22                         Office@ClarkBolen.com

23

24

25

1    not going to go ahead and let you have the

2    pricing so we had to be the API that served as

3    like the safe house between both parties.

4           Q.   So let me make sure I understand that,

5    Mr. Szwajkos.   At this point in time were you

6    still contemplating using GoodRx technology?

7           A.   Yeah, because the API just calls on

8    multiple discount cards but they would still be

9    the pre and post --

10                    (Reporter requested clarification.)

11          A.   The API -- you have to understand the

12   tech stack.

13          Q.   I'm sorry.   If we can just stick with my

14   question so that we don't -- we're not here all

15   day.   My question is to be -- so to be clear, in

16   this version of statement of work, you were

17   proposing to use GoodRx's technology?   That was

18   the question.

19          A.   We were proposing in this statement of

20   work to use our API to look up multiple discount

21   cards.

22          Q.   And what you were trying to also -- what

23   you were trying to get GoodRx to agree to here is

24   that you could use multiple discount cards, not

25   just GoodRx for the Prime technology.   That's why

1    you made these edits.

2         A.   We made these edits because, yes, we had

3    started those conversations.   Prime would never

4    go forward with just GoodRx.

5         Q.   Now, after a few more months of trying

6    to get a deal done with GoodRx, Bansi Nagji from

7    GoodRx got involved in trying to help get a deal

8    done, right?

9         A.   That is correct.

10        Q.   And Mr. Nagji was willing to consider

11   allowing an exception for Prime and allowing

12   Famulus to include other discount cards in the

13   solution for Prime.   That's what you discussed

14   with him, right?

15        A.   That is correct.   And we were thrilled

16   to hear what Bansi had to say.

17        Q.   And in exchange for allowing an

18   exception to exclusivity for Prime, GoodRx wanted

19   certain economic protections like guarantees or

20   make-up payments in the event another card was

21   selected over GoodRx, right?

22        A.   That is correct.

23        Q.   And you-all recall you were actually the

24   one who raised the idea of like a 95 or 96

25   percent guarantee for GoodRx, right?

1          A.   Yes, because we were basically saying,

2     hey, we understand we have an exclusive

3     arrangement with you so 95 percent of the

4     business is pretty much almost exclusive.  We

5     were trying to accommodate both parties.

6          Q.   And now you had a call -- you had a call

7     with Mr. Nagji in December of 2021 where you

8     discussed all of this, right?

9          A.   Yes, we did, and we actually requested

10    that call.

11         Q.   Okay.  Now, let me ask you to take a

12    look at Exhibit 78.  Exhibit 78 is an e-mail that

13    you sent to Bansi Nagji, Cynthia Meiners, and

14    Mark Stetson from GoodRx on December 22, 2021,

15    after your call with them, right?

16         A.   That is correct.

17         Q.   And under Action Items for Famulus, one

18    of the things you wrote was, The agreement will

19    lift the nonexclusive language for Prime.  Do you

20    see that?

21         A.   Yes, I do.

22         Q.   And the reason why you said that is

23    because you knew you needed GoodRx to agree to

24    make an exception for Prime or else you would be

25    violating the exclusivity clause contained in

1   your agreement with GoodRx, right?

2          A.   That is correct.

3          Q.   Now, I want to ask you to look at

4   Claimant's Exhibit 79.  And Claimant's Exhibit 79

5   is an e-mail from you to Mr. Nagji and

6   Ms. Meiners, copying Mike Waterbury from

7   Goodroot, dated January 3rd, 2022, right?

8          A.   That is correct.

9          Q.   And attached to this e-mail is the

10  draft -- is a draft of a statement of work that

11  your side prepared after the meeting and provided

12  to GoodRx, right?

13         A.   That is correct.

14         Q.   And if we look at the attached statement

15  of work, C-79, page 3 --

16         A.   Yes.

17         Q.   -- what you wrote under Exclusivity is,

18  This -- I think you probably meant "the" but

19  "This parties agree that any exclusivity language

20  in the agreement is no longer in effect as of the

21  work order date set forth above," right?

22         A.   Yes, that's correct.

23         Q.   Your proposal does not include any of

24  the economic proposals you discussed with GoodRx

25  on the call, right?

1     A.   They were still working those out with

2  them.   We were trying to find another that made

3  sense.

4     Q.   I won't find any mention of statement of

5  work about 95 or 96 percent volume commitments,

6  correct?

7     A.   Statement of work speaks for itself,

8  David.

9     Q.   I won't find any reference in this

10 statement of work about the make-up payments if

11 GoodRx's cash claim wasn't selected, correct?

12    A.   You have a copy of this statement of

13 work.

14    Q.   And ultimately you and GoodRx could not

15 get to an alignment on a deal for Prime, right?

16    A.   We worked tirelessly hard to get to a

17 deal with them.   I think all parties wanted to.

18 Respectfully, if I think we had a shot to

19 negotiate directly with Bansi from the beginning,

20 we would have had a better chance.

21    Q.   And even though you couldn't get

22 alignment on a deal with GoodRx for Prime,

23 Famulus went ahead anyway with Prime and has been

24 servicing Prime since at least August of 2022,

25 right?

1          A.   We have been servicing Prime since

2     August 18th of 2022.

3          Q.   And the Prime program includes multiple

4     cash cards that do not include GoodRx, correct?

5          A.   That is correct.

6          Q.   Now --

7          A.   That period of time, we also were not

8     under contract with GoodRx.

9          Q.   We're going to get into that a little

10    bit later too.  Yesterday --

11               MR. LENDER:  Your Honor, may I

12    approach?

13               THE ARBITRATOR:  Sure.

14          Q.   Yesterday -- I'm only using this for

15    context.  Yesterday you will recall that

16    Ms. Farnsworth showed you Respondent's Exhibit

17    78, and she actually had you read this entire

18    letter into the record.  Do you remember that?

19          A.   That's correct.

20          Q.   I wanted to show you, if I could,

21    Respondent's Exhibit 79.  Is Respondent's Exhibit

22    79 Ms. Meiners' response to your May 20th, 2022,

23    letter that Ms. Farnsworth had you read into the

24    record?

25          A.   Yes, it is.