# EXHIBIT C

**In the Matter Of:**

*In Re: Famulus Health, LLC*

*MICHAEL SZWAJKOS*

*August 01, 2024*



1

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF SOUTH CAROLINA

(CHARLESTON DIVISION)

---------------------------------------------------

In Re:

FAMULUS HEALTH, LLC,

　　　　Debtor.

Case No. 24-02019(EG)

---------------------------------------------------

REMOTE TESTIMONY OF MICHAEL SZWAJKOS -

DESIGNATED REPRESENTATIVE OF FAMULUS HEALTH, LLC

AUGUST 1, 2024 - 9:00 A.M. ET

JOB NO. 2024-951072

Page 2

```
 1
 2
 3                AUGUST 1, 2024
 4                9:00 A.M. ET
 5
 6
 7       DEPOSITION of MICHAEL SZWAJKOS, before S.
 8  Arielle Santos, Certified Court Reporter,
 9  Certified LiveNote Reporter and Notary Public.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1             REMOTE APPEARANCES:
 2
 3  COUNSEL FOR GOODRX, INC.:
 4  BY - JENNIFER BROOKS CROZIER
 5  BY - ALLIE ROSE
 6  BY - JARED MEZZATESTA
 7  WEIL, GOTSHAL & MANGES LLP
 8  767 Fifth Avenue
 9  New York, NY  10153
10
11  COUNSEL FOR FAMULUS HEALTH, LLC
12  BY - MICHAEL CONRADY
13  CAMPBELL LAW FIRM, PA
14  PO Box 684
15  Mt. Pleasant, SC 29465
16
17  ALSO PRESENT:
18      VALERIE BELTRAN, Monitor.
19
20
21
22
23
24
25
```

Page 4

```
 1                  INDEX
 2
 3  MICHAEL SZWAJKOS                      5
 4      BY JENNIFER BROOKS CROZIER:       5
 5
 6      EXHIBITS MARKED - ATTACHED
 7  Exhibit 1 - Notice of Deposition      6
 8  Exhibit 2 - Order Granting Permanent  8
 9      Injunction
10  Exhibit 3  - Famulus Ex 1            33
11  Exhibit 4 - Famulus Ex 2             39
12  Exhibit 5  - Monthly Savings         48
13  Exhibit 6 - Monthly Savings          48
14  Exhibit 7 - Proposal                 62
15  Exhibit 8 - Famulus Ex 7             74
16  Exhibit 9 - E-Mail                   90
17
```

Page 5

```
 1           MICHAEL SZWAJKOS
 2   MICHAEL SZWAJKOS, Affirmed, Testifies as
 3   Follows:
 4
 5           EXAMINATION
 6   BY JENNIFER BROOKS CROZIER:
 7       Q    All right.  Mr. Szwajkos, for
 8   the sake of the record my name is
 9   Jennifer Crozier from Weil, Gotshal &
10   Manges.  I represent GoodRx, Inc. in
11   connection with this matter.
12           You and I have been here before
13   so I am going to skip through some of the
14   introductory admonitions but I do want to
15   remind you that you have just taken an
16   oath to tell the truth, the whole truth,
17   and nothing but the truth just as you if
18   were in a court of law.
19           Do you understand?
20       A   Yes, I do.
21       Q   If you don't understand a
22   question I have asked, please ask me to
23   rephrase.  If you answer I will assume
24   that you have understood.
25           Is that fair?
```

**Page 94**

1       MICHAEL SZWAJKOS
2  can say that at the end of the day,
3  nobody is using these slides.  Nobody
4  used this information and our information
5  was built off a completely different
6  guidance that has nothing to do with this
7  slide.
8       Q    Mr. Szwajkos, I will ask you the
9  same questions I asked you a little while
10 ago which is you recall these issues were
11 litigated in the arbitration, right?
12      A    Yes, I am aware.
13      Q    And you understand that the
14 arbitrator took a different position than
15 Famulus' coming out of that arbitration,
16 right?
17      A    We respectfully appreciate the
18 arbitrator's position but I think most
19 other people would disagree with the
20 arbitrator and we will wait to see what
21 the Federal judge does and/or trustee if
22 it goes to that position because
23 fundamentally what you're looking at here
24 in this slide, is you're looking at a
25 claim flow.  And this claim flow is

**Page 95**

1       MICHAEL SZWAJKOS
2  actually under patent with another
3  company.
4            So how they can go ahead and say
5  that this particular confidential
6  information is theirs, it is not.  It is
7  actually owned and under two different
8  patents by McKesson and both patents were
9  filed two years in advance to when Ms.
10 Myers testified that she actually came up
11 with the idea.  They were filed in 2015.
12 And they were ultimately put into patent
13 in 2020 and 2023.
14           So as much as I appreciate
15 GoodRx is making a claim this is
16 confidential information, this is public
17 information that's actually in the patent
18 universe that's owned by McKesson which
19 actually is a creditor in this case.
20      Q    Mr. Szwajkos, I am not talking
21 about years back.  I am talking about
22 within the last 3 and a half months now,
23 or rather more than that I guess now,
24 five and a half months, have you
25 instructed AVIZVA to destroy any GoodRx

**Page 96**

1       MICHAEL SZWAJKOS
2  information?
3       A    We have not, not since
4  February 15th.
5           JENNIFER BROOKS CROZIER:  All
6      right.  Ms. Beltran, you can take
7      that exhibit down.
8  BY JENNIFER BROOKS CROZIER:
9       Q    Since February 15, 2024, have
10 you or has any Famulus agent, employee,
11 or representative marketed any assets or
12 property belonging to Famulus?
13      A    Absolutely not.  We have all our
14 assets under our control and all our
15 technologies are under our control and we
16 have not engaged in any way or had
17 conversation of any transaction of any
18 nature.
19      Q    Since February 15, 2024, have
20 you or has any Famulus employee, agent,
21 or representative sold any assets or
22 property belonging to Famulus?
23      A    Absolutely not.  We have not.
24 All our assets and technologies prior to
25 the arbitration award are still in our

**Page 97**

1       MICHAEL SZWAJKOS
2  full possession.
3       Q    Now I want to go back to the
4  beginning of the year, January 1st, 2024.
5           Since then, have you or has any
6  Famulus employee, agent, or
7  representative discussed the repayment of
8  debt with any of Famulus' creditors or
9  contractual counterparties?
10      A    So please explain -- clarify
11 your question.
12           Are you asking that we have
13 reached out to a creditor to pay them in
14 advance from January 1st of 2024.  I just
15 want to make sure I understand the
16 question.
17      Q    Right.  So Topic 14 to your
18 deposition notice, Mr. Szwajkos, is
19 Famulus and its creditors or contract
20 counterparties, other than GoodRx,
21 discussing the repayment of debt.
22           Do you recall that that was one
23 of the topics to your deposition notice.
24 If you need to consult Exhibit 1, that's
25 fine.

Page 98

1 MICHAEL SZWAJKOS
2 A (Reviewing.) Yeah, I mean we
3 have certainly had debt to people and
4 they have reached out to us to ask us but
5 we haven't, you know -- we have been
6 working through paying what we could as
7 best we could with what we had, so I
8 mean, you know, we obviously have filed
9 the schedule in the bankruptcy, you guys
10 have a record of all our creditors and
11 what they are owed, and, you know,
12 certainly it would come up in normal
13 conversations, saying hey, you're behind,
14 you know, whether it's 30 days, 60 days,
15 whatever it may be, we were getting
16 caught up with most people in a pretty
17 good position before, you know, as we got
18 into the year.
19    Q    Okay.
20         So you testified that you have
21 debt to people and they have reached out
22 to ask -- to ask you about repayment I
23 guess; is that a fair characterization of
24 your testimony?
25    A    No. I am just saying they would

Page 99

1 MICHAEL SZWAJKOS
2 ask follow up with us in routine and send
3 us invoices and say hey, you know, we
4 would just be regular communications with
5 clients, getting caught back up on
6 invoices, but yeah, whatever services
7 were provided, you know, we had invoices,
8 and in most cases we were current.
9         The only client that we were
10 significantly behind was AVIZVA and there
11 were conversations with AVIZVA just
12 asking hey when will you get caught up.
13 But with the rest of our clients we were
14 pretty current. So there wasn't much to
15 talk about. We would get an invoice and
16 pay it.
17    Q    And --
18         (Simultaneous Crosstalk.)
19    A    Pre-filing of the bankruptcy. I
20 mean, this is certainly regular business
21 practice. They would send invoices and
22 we would pay them.
23    Q    How much does Famulus owe AVIZVA
24 currently?
25    A    I mean, it's in the schedule and

Page 100

1 MICHAEL SZWAJKOS
2 I am going to take a guess as close I
3 could but I believe it's somewhere around
4 1.4 million but I would defer to the --
5 my answer would be to defer to the filing
6 we put in for bankruptcy for the exact
7 number. But it's certainly note of a
8 million dollars and a ballpark of about
9 1.4.
10    Q    And what were the substance of
11 yours or Famulus' discussions with AVIZVA
12 in terms of repaying that debt?
13    A    We would let them know we are
14 getting caught up. As we got into 2024,
15 as the system continued to bring on more
16 health plans for Prime, we were in a
17 position where we were pretty financial
18 stable moving forward that we would get
19 caught up on that debt and that was our
20 intent and hope.
21    Q    And when did that -- roughly
22 when did those communications take place?
23    A    I can't recall. I mean, you
24 know, we would be behind on a payment
25 and, you know, Sharad would reach out to

Page 101

1 MICHAEL SZWAJKOS
2 me, hey, when are you guys going to be
3 able to get caught up, we would have a
4 quick phone call on it and that would be
5 it. I mean, we would -- we certainly,
6 you know, have a record of those
7 payments.
8    Q    Has Famulus engaged in any other
9 discussions with large creditors on the
10 order of AVIZVA with respect to the
11 repayment of debt?
12    A    No, because I mean most people
13 were current so there wasn't debt with
14 the other clients. AVIZVA was the only
15 vendor that was running behind.
16    Q    Now you testified a moment ago
17 that Famulus was getting caught up as the
18 system brought on more health plans for
19 prime.
20         Do you recall that testimony?
21    A    Yes, I do.
22    Q    What do you mean by "the system
23 bringing on more health plans for Prime"?
24    A    I mean, this gets to the core of
25 sort of what we talked in the

Page 114

1  MICHAEL SZWAJKOS
2 you know, agency that was out there
3 working on behalf of Famulus.  And that
4 was pre-negotiated with Mr. Waterbury and
5 Ms. Frank, you know, prior to whatever
6 she went out and sold.  And when she sold
7 the Prime deal, as part of that deal, she
8 was -- you know, we agreed that we would
9 give her 10 percent of the top line
10 revenue.
11     Q    Has Famulus changed or added any
12 employee compensation programs or
13 processes since June 3, 2024?
14     A    No.  No, we just have the four
15 employees at their biweekly salaries.
16          We're happy -- I'm happy to
17 disclose all of that information.
18     Q    Do Famulus' liabilities exceed
19 its assets?
20     A    Does our liabilities exceed our
21 assets?  I think that's in the eye of the
22 beholder.  I mean, I can't answer that
23 question.  Because right now, under our
24 current litigation, it's impossible to
25 tell what the value of our assets are.

Page 115

1  MICHAEL SZWAJKOS
2 At one time, we had incredible valuable
3 assets.  But now that we're under
4 litigation, certainly in bankruptcy
5 proceedings, I mean, I would have no idea
6 to assess what those assets and
7 liabilities will be.
8          I mean, I know we certainly have
9 a large claim that you guys are arguing,
10 and, you know, we certainly have other
11 claims from other creditors.
12     Q    If the arbitration award were
13 confirmed and the injunction entered by
14 the District Court, would Famulus'
15 liabilities exceed its assets?
16     A    Actually, I don't believe so.
17 Because, I mean, our other line of
18 business and our other client is
19 incredibly profitable, and we would
20 certainly be running in a very profitable
21 situation.
22          If Prime were to shut down
23 tomorrow, Famulus can proceed, move
24 forward and be incredibly profitable,
25 assuming that we're allowed to be

Page 116

1  MICHAEL SZWAJKOS
2 dismissed from the Bankruptcy Court.
3     Q    Mr. Szwajkos, you understand
4 that the arbitration award awards GoodRx
5 55 -- approximately $55 million in
6 damages, right?
7     A    I understand that.
8     Q    If that award is confirmed, then
9 Famulus will owe GoodRx $55 million,
10 correct?
11     A    Not necessarily.  Because I
12 think -- I mean, you know, we certainly
13 have to wait to see what the District
14 Court were to find.  But we certainly
15 feel there's also a very strong argument
16 that that award was based off people
17 testifying and lying under oath.  And
18 certainly an appeal process or something
19 like that, it could be pursued.
20          So I mean, you know, you can't
21 say that you own a technology or a
22 solution when other companies have a
23 patent on it.  And there's certainly a
24 lot of evidence now that has come out
25 post arbitration that we believe would

Page 117

1  MICHAEL SZWAJKOS
2 certainly show that, you know, a lot of
3 the testimony that was presented to the
4 arbitrator certainly wasn't accurate.
5     Q    Mr. Szwajkos, is Famulus able to
6 pay its debts as they come due?
7     A    If given an opportunity -- and I
8 will set the GoodRx claim to the side --
9 we could pay all of the creditors in 60
10 to 90 days.  So we feel there's a very
11 viable path that we could certainly pay
12 our creditors in a short period of time,
13 or at least minimum, from very -- what we
14 would think being thoughtful strategy to
15 ensure that all creditors are paid in
16 full.
17          And then certainly we would have
18 to address the claim from GoodRx.
19 Because, I mean, the thing about it is,
20 when you look at the creditors we have
21 today, we actually have invoices and we
22 know what those services are that have
23 been provided that haven't been paid.
24 GoodRx's claim is contingent and
25 unliquidated, so we don't know what that

**Page 118**

MICHAEL SZWAJKOS

is.

I understand that the arbitrator awarded 55 million, but we don't know what the Federal judge will do.

So right now, I would say, as far as GoodRx stands, we have no idea what that claim will be, and we certainly are prepared to address it with GoodRx when presented.

Q  Is Famulus able to operate as a going concern?

A  I mean from our standpoint, no. We feel -- if the case is dismissed, we feel a hundred percent comfortable we can move forward and operate and be profitable.

Q  If the District Court confirms the arbitration award and enters the injunction, would Famulus then be able to continue operations?

A  Well, based on other clients and other revenue streams that fall outside the injunction, that's still a very viable and profitable line of business.

**Page 119**

MICHAEL SZWAJKOS

So we would feel -- I mean our intent is we would absolutely like to proceed and move forward and we certainly recognize that, you know, we will have to manage some kind of situation with GoodRx, but I think as you're certainly aware, we are actively trying to do that as much as we are litigating this particular issue now and going to man it forward on a parallel path. We would obviously like to find a path and work with GoodRx to settle as well.

Q  Mr. Szwajkos, has Famulus continued to perform under the Prime agreement during its Chapter 11 case?

A  Clarify what you mean by "perform."

Q  You're continuing to offer integrated cash solution to Prime, correct?

A  That is correct.

Q  Do you agree that the injunction by its terms prohibits performance under the prime agreement?

**Page 120**

MICHAEL SZWAJKOS

A  We understand that there's a pending injunction that hasn't been enforced in a federal court and we don't know if that injunction is going to be modified. We don't know what that looks like. So we need to see what the actual injunction is that the court orders whenever it does.

So I mean we understand that, yes, there is an injunction out there from the arbitrator but we are held accountable in South Carolina to what the federal court will rule on and that's what we are waiting for.

I mean, we obviously, as you know, both parties have already -- to get that vacated and we have equally argued to get that modified. We feel the original arbitration award and injunction was egregious and certainly way too broad because it falls way outside the lines of integrated cash.

But regardless, we are hoping that, you know, certainly the Federal

**Page 121**

MICHAEL SZWAJKOS

judge will find some order that's manageable for us but even if it comes down in the particular order as is, we still have other clients that we operate today that fall outside of that order that would not be held under it.

Q  But if the injunction were entered as is, that injunction would prohibit performance under the Prime agreement, correct?

A  If you are looking at the original injunction that came from the arbitrator, then yes, Prime -- the Prime Solution or the integrated cash product we provide Prime, yes, that would have to be shut down based on the ruling for the court.

Q  Do you agree that the Prime agreement is Famulus' main source of revenue?

A  It's certainly a strong source of revenue but it's not the only primary. Prime makes up about 65 percent of our revenue.

**Page 122**

1  MICHAEL SZWAJKOS
2  Q   What makes --
3      (Simultaneous Crosstalk.)
4  A   There's certainly plenty of
5  other revenue and the other thing too is
6  not only does Prime make up, you know,
7  65 percent ballpark, but they also are
8  probably one of our single largest
9  operating expenses.  When you get into
10 the other technologies and what we make
11 on those, those are far more cost
12 effective to run and certainly very
13 profitable for us.
14 Q   What -- what business lines make
15 up the other percentage of Famulus'
16 revenue?
17 A   We actually service one of the
18 largest retails in America with a
19 business intelligence tool that has
20 nothing to do with the Solution and has
21 nothing to do with integrated cash and it
22 falls way outside of that definition or
23 anything in the arbitrator's order, the
24 original order, that you are speaking to.
25     We provide business intelligence

**Page 123**

1  MICHAEL SZWAJKOS
2  tool that creates operational
3  efficiencies in a pharmacy.  It's
4  incredibly super exciting technology that
5  we built.  It's completely different than
6  anything in integrated cash.  It would be
7  falling outside of the injunction.  And
8  at the end of the day, we hope, if the
9  case is dismissed, to take that
10 particular product in the settle of the
11 retailers growing what we believe quickly
12 back to our original revenue lines of
13 what we had because like I said it's a
14 very profitable product in a single
15 retailer so we -- we are actually
16 thrilled about it.
17     It's much more exciting than
18 integrated cash and it's created a lot of
19 value for our client and they love it, we
20 love it, and we look forward to hopefully
21 getting an opportunity to sell that to
22 other people soon but we want to do that
23 outside of bankruptcy.
24 Q   And what is that product?
25 A   That product is an operational

**Page 124**

1  MICHAEL SZWAJKOS
2  efficiency tool that's embedded in a
3  point of sale system that allows that
4  product to manage task at the counter for
5  the pharmacy text in a very quick and
6  efficient manner.
7  Q   Does the product have a name?
8  A   We just call it business
9  intelligence tool for pharmacy but I
10 would just say, you know, I am under
11 confidentiality and, you know, certainly
12 you know, want to respect that client's
13 contract but you can go to your client,
14 they are very much aware of what we do.
15 I have been told by my client that GoodRx
16 fully understands that Famulus has a
17 relationship with this client and GoodRx
18 is aware of that relationship and the
19 contractual agreement between the two
20 parties.
21     So, it's actually a pretty
22 innovative product that's really changed.
23 I mean as referred to some of the
24 operators that work inside of this retail
25 chain, they said it was a single greatest

**Page 125**

1  MICHAEL SZWAJKOS
2  technology that was introduced to their
3  staff in over 10 years.
4  Q   To whom does Famulus currently
5  offer this technology?
6  A   I can say that it's a very large
7  retail chain, one of the largest, but I
8  am under confidentiality.  Like I said,
9  your client can certainly go ahead and
10 tell you exactly who it is.  GoodRx knows
11 who that client is.
12 Q   Well, Mr. Szwajkos, I'm asking
13 you and you have an evidentiary burden in
14 connection with your motion to dismiss
15 your Chapter 11 case and to the extent
16 you want to offer evidence to support or
17 carry that burden, you need to disclose
18 the details here so that we can test that
19 evidence and we are entitled to do that.
20     So I'm asking you, as Famulus'
21 representative today, to whom does
22 Famulus offer this business intelligence
23 tool?
24 A   I will certainly go to the
25 client and ask for their permission.  I

MICHAEL SZWAJKOS

have gone to them but please understand I am internally conflicted here.

You are asking me to disclose it as part of this. I am obviously under confidentiality which would get me in certainly breach of that agreement on the other side and the last thing I would like right now, Jennifer, is any more litigation against me.

But I would say it's one of the largest retailers in America. That's a very short list.

Q Did Famulus develop this business intelligence tool?

A Yes, we did.

Q When?

A Went live after the arbitration.

Q In December of 2024, January of 2025? When after the arbitration did it go live?

A It went live in December of 2023.

Q December 2023. And when did Famulus enter into an agreement with the



MICHAEL SZWAJKOS

client concerning this business intelligence tool?

A I don't recall. It was some time in the fall there. Off the top of my head, I don't have the exact, but it certainly was -- it was a relatively short implementation period, so I don't know off the top of my head.

I would say some time definitely in the fall of 2023. We entered into that agreement with our client and certainly it's been a good partnership ever since.

Q And what -- what services does Famulus offer to the client under the agreement?

A Pharmacy switch services which is like I said -- we are trying to educate people. We are pharmacy switch. We provide pharmacy switch services to them and that is something that GoodRx does not do, does not have any capabilities of, and they don't own, operate, or have any software that does



MICHAEL SZWAJKOS

switch technology for a pharmacy.

Q Mr. Szwajkos --

A I mean, a switch like Change and Relay, like the actual pharmacy switches --

Q -- what's the --

(Simultaneous Crosstalk.)

A -- prices and stuff.

Q Mr. Szwajkos, what is the basis for your testimony about what GoodRx can or cannot do?

A Because it falls outside of the injunction and that product certainly has -- well outside of the injunction and we know GoodRx certainly doesn't -- they do not own a switch. They don't operate a switch. They cannot functionally perform switch technology.

They contract with Change Healthcare to get there switch technology services under a licensing agreement and we are a fully functioning switch that provides those services to a pharmacy no different than Change or Relay. I think



MICHAEL SZWAJKOS

it is critical because our client knows and certainly everybody in the industry, we are performing a service to them that's well outside the injunction.

Q When you say pharmacy switch services, are you referring to your FAST technology?

A No. I am referring to is we are a core switch -- a core pharmacy switch which allows us to act, connect into PBMs, and/or into other switches, and allows us to route traffic, take full possession of the packet, and actually have the ability to connect into a PBMs and perform the action of adjudication on our own. We don't have to license that technology from someone else to do it.

Q Mr. Szwajkos, does -- does Famulus offer its FAST technology to this large retail chain pursuant to this agreement that was negotiated in or around the fall of 2023?

A No. We offer custom-based technology that was built from scratch

### Page 130

```
 1                MICHAEL SZWAJKOS
 2   for them and we use what is our pharmacy
 3   switch components to operate that.  That
 4   has nothing to do with FAST.
 5       Q    What fees does Famulus receive
 6   in connection with this arrangement --
 7   with this large retail chain?
 8       A    We provide fees and services
 9   which are called switch fees.  Every time
10   we perform a transaction for them or we
11   route or initiate a transaction, we are
12   paid a fee.
13       Q    And what is the extent of those
14   fees on a monthly basis?  What are the
15   fees received from this large retail
16   chain on a monthly basis?
17       A    I mean, it's consistently grown
18   month over month because they have rolled
19   it out.  It's obviously a very, very
20   large chain.  You know it's certainly
21   right now -- in the ballpark around --
22   just under 400,000 and growing.  But you
23   know we believe over the next three to
24   four months it probably be churning half
25   a million, $600,000 a month.
```

### Page 131

```
 1                MICHAEL SZWAJKOS
 2            But certainly, like I said, we
 3   are paid standard switch fees, no
 4   different than Change or Relay.  We are
 5   just routing traffic for them.  And we
 6   get paid a small denominal [sic] fee.
 7   But we are generating a lot of
 8   transactions per day.
 9       Q    What is the nature of this large
10   retail chain's business?  For example --
11            (Simultaneous Crosstalk.)
12            It's a pharmacy chain?
13       A    This is -- which -- I will say
14   this, I mean, you know, I'm certainly not
15   afraid you know to disclose this
16   deposition here.  We share with David
17   Cohen.  It's remarkable to me that GoodRx
18   would pursue this conversion to Chapter 7
19   knowing that their life blood of their
20   business is pharmacy chains and this
21   pharmacy chain is a hundred percent aware
22   of everything going on, that they would
23   intentionally shut down an operational
24   technology that is incredibly important
25   to them and that chain knows that will
```

### Page 132

```
 1                MICHAEL SZWAJKOS
 2   come at basically, you know, GoodRx
 3   pushing the issue.
 4            So I don't know how they gain
 5   with that.  Because if you're in the
 6   discount card business, which GoodRx is,
 7   how do you go ahead and funds mentally
 8   shut down a very important technology to
 9   one of your largest partners in the
10   United States and, yes, they are aware of
11   it and watching it very closely.
12            JENNIFER BROOKS CROZIER:
13        Move to strike the non-responsive
14        portion of that answer.
15        Everything after "it's a pharmacy
16        chain."
17   BY JENNIFER BROOKS CROZIER:
18       Q    Mr. Szwajkos, you said that --
19   you testified earlier that Prime
20   represents approximately 65 percent of
21   Famulus' revenue.
22            What percentage does this deal
23   with this large retail chain represent?
24       A    Vast majority of the other side.
25   We have a couple of other small clients,
```

### Page 133

```
 1                MICHAEL SZWAJKOS
 2   but, I mean, you know it's an interesting
 3   dynamic right now because every month the
 4   other pharmacy chain continues to grow
 5   and percentagewise, you know, as much as
 6   Prime's revenue has been consistent, the
 7   pharmacy chain is growing, the Prime
 8   businesses remain pretty stable, and
 9   every month it continues -- that shift
10   continues to take place.  But right now
11   like I said it's like 65/35 percent
12   ballpark.
13       Q    You mentioned other clients to
14   which Famulus offers services or
15   technology.  What other clients are
16   those?
17       A    We have a small client called
18   Neighborhood Health which is a health
19   plan that we provide reconciliation
20   services to and what that is, it's
21   nothing more than an audit of their
22   network.  They don't use any technology.
23   They actually use reporting platforms,
24   something called Echo and we just take
25   their pharmacy data in and package it up
```

## Page 134

1  MICHAEL SZWAJKOS
2 on the screen so they can see and monitor
3 the data and just monitor the network and
4 how it's performing.
5  So once again that's a product
6 that's outside of FAST.  It has nothing
7 to do with it.
8  Q  What -- does Famulus own the
9 Echo technology?
10  A  Yes.  Yes.
11  Q  Did Famulus develop the Echo
12 technology?
13  A  Yes, we did.
14  Q  When did Famulus enter into its
15 agreement with Neighborhood Health with
16 respect to the Echo technology?
17  A  I can't remember, but it's been
18 a long time ago.  We've been doing it for
19 I believe almost two full years.  Off the
20 top of my head, I have no idea what that
21 is, but it's -- it's a reporting
22 platform where information comes in on
23 their network and their claims and their
24 people, and they use it in their
25 corporate headquarters to monitor

## Page 135

1  MICHAEL SZWAJKOS
2 financial performance of what's happening
3 in their pharmacy network.
4  They also use it to audit -- for
5 audits, you know, they have to perform
6 with their PBM as well.
7  Q  And what fees does Famulus
8 receive under the agreement with
9 Neighborhood Health?
10  A  It's a very small fee.  We get
11 paid a small quarterly fee that's really
12 not that material.
13  Q  What is that small quarterly
14 fee?
15  A  I mean, in a given year, it's
16 100- to $200,000.  It's not that much.
17 It's consulting work that fluctuates, so
18 it's not -- as they ask us to perform
19 audits, we perform them and we just put a
20 fixed price on those audits and they --
21 we manage it for them.
22  Q  What other clients does Famulus
23 offer services or technology to?
24  A  That's it.
25  Q  All right.  And so we have

## Page 136

1  MICHAEL SZWAJKOS
2 Prime, which you testified represents
3 approximately 65 percent of Famulus'
4 revenue; the large retail chain, the
5 pharmacy chain, which you testified
6 represents approximately 35 percent of
7 Famulus' revenue; and Neighborhood
8 Health, which represents, I believe you
9 testified, a de minimis amount of
10 Famulus' revenue.
11  Is that an accurate summary?
12  A  Yeah.  Yeah.  I mean, like I
13 said, if you take 100- to $200,000 on
14 what is a 15 to $16 million annual trend,
15 yeah, that's what they represent,
16 Neighborhood Health.
17  Q  Did Famulus design or develop
18 the business intelligence tool that it is
19 currently offering to the large pharmacy
20 retail chain -- or retail pharmacy --
21  (Simultaneous Crosstalk.)
22  A  -- a custom product -- was a
23 custom product that they engaged us to
24 build just specifically for them.
25 BY JENNIFER BROOKS CROZIER:

## Page 137

1  MICHAEL SZWAJKOS
2  Q  Does Famulus own that
3 technology?
4  A  That's a little bit of a
5 wildcard right now.  Because at the end
6 of the day, while we're under the
7 bankruptcy proceedings, we have fallen
8 behind in payments.  And because of, you
9 know, the question with our IT vendors,
10 whether we own it or they own it, you
11 know, contractually because we're behind
12 on payments, they technically -- I mean,
13 they've been good partners and they've
14 been allowing us to run it, but they
15 would certainly have a legal claim to
16 that technology.
17  Q  On what would that claim be
18 based?
19  A  The fact that we're behind.  And
20 once you get so far behind on payments --
21 and we weren't allowed to pay them in the
22 bankruptcy period -- they have the right
23 to take the code back.
24  Q  Are you basing that statement on
25 a document?  For example, a contract,